SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-09-0199-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR1999-095294 |
| SHAWN RYAN GRELL, | ) | |
| | ) | **O P I N I O N** |
| Appellant. | ) | |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Teresa A. Sanders, Judge

**SENTENCE REDUCED**

_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Criminal Appeals/Capital Litigation
          Amy Pignatella Cain,                               Tucson
          Assistant Attorney General
Attorneys for State of Arizona

LAW OFFICE OF TREASURE VANDREUMEL, P.L.C.                    Phoenix
     By   Treasure L. VanDreumel
Attorney for Shawn Ryan Grell

_____

**B E R C H**, Chief Justice

**¶1**      Shawn Ryan Grell murdered his two-year-old daughter, Kristen Grell, by pouring gasoline on her and lighting her on fire.[1]  Following a bench trial on stipulated facts, the trial

_____

[1]      For a more detailed statement of facts relating to the underlying crime, *see State v. Grell* (*Grell I*), 205 Ariz. 57, 58-59 ¶¶ 3-15, 66 P.3d 1234, 1235-36 (2003), and *State v. Grell* (*Grell II*), 212 Ariz. 516, 518 ¶¶ 3-4, 135 P.3d 696, 698 (2006).

court found Grell guilty of first degree murder and sentenced him to death. While his direct appeal was pending, the United States Supreme Court issued *Atkins v. Virginia*, 536 U.S. 304 (2002), which prohibits states from executing defendants who have mental retardation. On appeal, we upheld Grell's conviction but remanded the case to the trial court to determine whether Grell had mental retardation that would bar imposition of the death penalty. *State v. Grell* (*Grell I*), 205 Ariz. 57, 64 ¶ 43, 66 P.3d 1234, 1241 (2003). In 2005, the trial court determined that Grell did not meet his statutory burden of proving mental retardation by clear and convincing evidence, a finding we affirmed. *See State v. Grell* (*Grell II*), 212 Ariz. 516, 529 ¶ 63, 135 P.3d 696, 709 (2006). We nonetheless remanded the case again for resentencing because Grell had preserved his right to a jury sentencing under *Ring v. Arizona*, 536 U.S. 584 (2002). *Grell II*, 212 Ariz. at 529-30 ¶¶ 66-67, 135 P.3d at 709-10. The jury returned a death verdict, triggering this automatic appeal. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031 (2003).

## I. ISSUES ON APPEAL

¶2 Grell raises several issues on appeal, most of which center around his claim that he suffers from mental retardation. While he concedes that he killed his daughter, he contends that

*Atkins* requires us to reduce his sentence to life in prison because of his mental retardation. In light of our conclusion on independent review that Grell has proved mental retardation and our consequent reduction of Grell's sentence to natural life, we do not address Grell's other claims.

## II. INDEPENDENT REVIEW

¶3 Because this capital murder occurred before August 1, 2002, we independently review the propriety of the death sentence. A.R.S. § 13–755(A) (Supp. 2010).[2]

### A. Aggravating Factors

¶4 The jury found three aggravating factors under A.R.S. § 13–751: (F)(2), conviction for a prior serious offense (robbery); (F)(6), the murder was especially heinous, cruel, or depraved; and (F)(9), the young age of the victim. On independent review, we find that the State proved all three aggravating factors beyond a reasonable doubt, but do not address them in detail in light of our conclusion that Grell is not subject to the death penalty by reason of mental retardation.

### B. Mental Retardation

¶5 Arizona law defines mental retardation as a condition bearing three hallmarks: "[1] significantly subaverage general

---

[2] Because the statutes have not materially changed during the pendency of this case, we cite the current version, unless otherwise noted.

intellectual functioning, existing concurrently with [2] significant impairment in adaptive behavior, [3] where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen." A.R.S. § 13-753(K)(3).[3] In our independent review, we apply this statutory definition as a guide in determining whether Grell has established mental retardation, and, consistent with A.R.S. § 13-751(C), apply a preponderance of the evidence standard of proof for the penalty phase.

### 1. Subaverage intellectual functioning

**¶6** "Significantly subaverage general intellectual functioning" is the touchstone for proving mental retardation and means "a full scale intelligence quotient [IQ] of seventy or lower," A.R.S. § 13-753(K)(5). Grell has taken seven IQ tests since 1981. Discarding the lowest and highest scores, his remaining test scores were 72 (1981), 67 (1984), 69 (1984), 70 (1987), and 65 (1989), which demonstrate "significantly subaverage" intellectual functioning. The State therefore stipulated that Grell's IQ scores satisfy the first statutory element of mental retardation, significantly subaverage general intellectual functioning. *See Grell II*, 212 Ariz. at 520 ¶ 16,

---

[3] The legislature amended this statute, changing "mental retardation" to "intellectual disability." *See* 2011 Ariz. Sess. Laws, ch. 89, § 5 (1st Reg. Sess.). We use "mental retardation" in this opinion because that is the term employed by the parties and doctors in this case.

135 P.3d at 700.

## 2. Significantly impaired adaptive behavior

**¶7** "'Adaptive behavior' means the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." A.R.S. § 13-753(K)(1).

**¶8** In 2005, after our first remand of this case, the trial court considered testimony on Grell's adaptive behavior from two defense experts, Drs. Globus and Wicks, and the State's expert, Dr. Scialli.[4] Relying on Grell's educational and correctional records and their personal evaluations of Grell while he was incarcerated, Drs. Globus and Wicks opined that Grell had severe deficits in adaptive behavior. Dr. Scialli, however, diagnosed Grell with antisocial personality disorder. He relied on Grell's educational and correctional records and found persuasive a Vineland Adaptive Behavior Scale, administered to Grell's mother when Grell was approximately nine years old, which showed Grell's adaptive skills as only slightly below average.

**¶9** In 2005, the trial court relied heavily on Dr.

---

[4] Those experts testified in the penalty phase of Grell's first trial in 2001. After our first remand of the case, the trial court did not conduct an evidentiary hearing, but rather, pursuant to the parties' agreement, ruled on the mental retardation issue in 2005 based on the record of the 2001 proceedings.

Scialli's opinions to find that Grell had not proved by clear and convincing evidence that he had significant deficits in adaptive behavior. We affirmed in 2006, deferring to the trial court's determinations because "[r]easonable minds [could] differ as to how to interpret the evidence presented." *Grell II*, 212 Ariz. at 529 ¶ 63, 135 P.3d at 709.

**¶10** Our current inquiry differs from that in *Grell II*. Here, we must *independently* review the evidence presented in the 2009 resentencing trial to determine whether Grell proved mental retardation by a preponderance of the evidence. *See* A.R.S. §§ 13-755; 13-751(C) (setting forth defendant's standard of proof in penalty phase). This standard of proof is less demanding than the clear and convincing evidence standard required for a pre-trial finding that mental retardation barred imposition of the death penalty. *See id.* § 13-753(G) (providing for "clear and convincing" burden of proof for pre-trial *Atkins* determination). In our independent review, we "do not defer to the jury's findings or decisions" or necessarily afford evidence the same weight it received at trial. *See State v. Prince*, 226 Ariz. 516, 539 ¶ 93, 250 P.3d 1145, 1168 (2011).

**¶11** Grell presented substantially more – and more convincing – evidence of adaptive skill deficits in his 2009 resentencing hearing than he presented in 2005. For example, in 2005, the trial court found Grell's school records highly

- 6 -

persuasive in showing that he did not have deficits in adaptive behavior. Several grade school records that were used to place Grell in special education classes noted his "high adaptive skills and successful integration," and observed that he "demonstrated good adaptive skills [and] ability to relate conversationally, demonstrated spontaneity, and demonstrate[d] appropriate behavior for the test situation." The trial court acknowledged that school officials had nonetheless consistently concluded that Grell had a mental handicap or disability sufficient to require his placement in special classes, but it dismissed these educational diagnoses, observing that "no mental expert has ever diagnosed [Grell] as being mentally retarded" before Grell committed the murder.

¶12       In 2009, however, the defense called several witnesses from Grell's childhood schools to explain these records. Frederick Krueger, the special education director in Grell's elementary school district, ran the program that classified students for placement in special education classes. He explained that his program used the term "mental disability" as the educational equivalent of "mental retardation" and applied the same three-prong definition that the Diagnostic and Statistical Manual ("DSM") established for mental retardation. Based on this definition, Mr. Krueger's team consistently concluded that Grell had a mental disability. Mr. Krueger

therefore approved placing Grell in a class for mentally disabled (i.e., mentally retarded) students.

¶13     Charlene Thiede, a social worker who helped evaluate Grell for special education placement, explained that the "high adaptive skills" assessments in his grade school records compared Grell's adaptive skills to the skills of other students with disabilities, not to students in the general population. She testified that Grell had adaptive deficits in that he was highly impulsive, could not understand social cues that children his age should understand, and was largely unable to use the few social skills that he had. She confirmed that Grell fell well within the school's mental retardation criteria.

¶14     Nona Smith, one of Grell's special education teachers, also confirmed that although Grell showed some adaptive skills – such as good communication and good eye contact – his skills were "good" only by comparison to the adaptive skills of similarly disabled students, not when compared to non-disabled children. She believed Grell belonged in classes for children with mental retardation, not in the behavioral and learning disabled classes in which he was later placed in middle school. Another of Grell's special education teachers, Marilyn Charron, reiterated that Grell's primary disability was mental retardation, although he also suffered from serious behavioral issues.

¶15    The State argues that we should not rely on testimony from school employees or the school records diagnosing Grell with a "mental disability" or "mental handicap" because these were merely educational diagnoses that might not have considered adaptive skills. We are not persuaded. Mr. Krueger testified that the educational evaluations were based on the criteria set forth in the DSM, the manual used for clinical mental retardation diagnoses. He stated that when educators of the time used the term "mental disability," it meant "mental retardation." Ms. Thiede concurred. Moreover, the school records specifically address Grell's adaptive skills. Ms. Thiede and Ms. Smith both discussed elements of Grell's behavior that were relevant to "the effectiveness or degree to which [Grell] meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." *See* A.R.S. § 13-753(K)(1). Grell presented evidence corroborating the mental retardation conclusions in these school reports and explaining why "high adaptive skills," a phrase relied upon by the State's expert, was misleading when not placed in context.

¶16    The school records reviewed by the trial court in 2005 appeared to suggest good adaptive skills, but when fully explained in 2009 and properly understood, those records instead establish that Grell has suffered from adaptive behavior

deficits since he was a young child. These school records, notably, were created in Grell's youth, for an educational purpose unrelated to these proceedings or any other litigation. The teachers and social workers who relied on them had no motive to fabricate or distort their observations or findings.

¶17 In addition to the new evidence regarding Grell's school records and grade school evaluations, other evidence has changed significantly between 2005 and 2009. In 2009, Drs. Globus, Wicks, and Scialli essentially repeated the opinions the trial court considered in 2005. But at the 2009 hearing, the defense presented testimony from two additional experts, both of whom effectively rebutted the State's evidence and persuasively explained why Grell's history indicates significant deficits in adaptive skills.

¶18 In 2009, the defense called Dr. Mark Cunningham, a board certified forensic and clinical psychologist and research scientist with thirty years' experience. Dr. Cunningham reviewed Grell's school and juvenile justice records to evaluate his adaptive skills and concluded that Grell suffered severe deficits in several categories relevant to assessing mental retardation. He determined that Grell's continuous behavioral problems and poor social functioning were grounded in mental retardation because they were consistent throughout Grell's childhood, whereas pure antisocial or personality disorders

would have varied over time. Dr. Cunningham considered Grell's inability to control himself in unstructured situations and his tendency to act more like children several years younger as additional evidence of Grell's poor adaptive skills. If Grell had a mere conduct or personality disorder, Dr. Cunningham reasoned, he would have committed acts that were simply against the rules and deviant (like stealing lunch money), rather than acting, as he did, in ways that were embarrassing or immature (like throwing tantrums).

¶19 Dr. Cunningham concluded that Grell suffered severe adaptive skill deficits, despite his ability to occasionally demonstrate adaptive behavior in some areas. For example, Grell created and maintained a false identity to avoid being prosecuted as an adult, a behavior the trial court relied on in 2005 to show Grell's adaptive capabilities. But Dr. Cunningham explained that this ruse did not necessarily indicate strong adaptive skills. He posed the question as whether a child at Grell's functional intelligence level (eight to eleven years old) would be capable of creating and carrying on such a ruse; and the answer was clearly "yes."

¶20 Dr. Cunningham also testified that the Vineland test relied upon by the trial court in 2005 was not properly administered. Rather than asking Grell's mother to answer questions about her nine-year-old son's behavior, which is the

proper way of administering the test, Grell's mother reportedly was handed the test to fill out herself. This procedure likely affected the validity of the test because the administrator is required to adapt the questioning to probe for descriptions of behavior in several categories. That would not have occurred if Grell's mother self-administered the test. Dr. Cunningham also noted that the mother's statements, and hence the results of the test, were inconsistent with teachers' and administrators' in-class observations of Grell as a child, which showed him to be impulsive, inattentive, and unable to communicate effectively. Dr. Cunningham thus opined that the results did not reflect Grell's actual adaptive skills and that an accurate score would have been much lower. The record also includes evidence that Grell's mother did not want her son to be labeled "mentally retarded," which may have biased her responses. We therefore afford this test little weight.[5]

---

[5] Both the defense and prosecution conducted additional adaptive skills tests after Grell committed the murder. The defense conducted a second Vineland test and a Scale of Independent Behavior, both of which showed severe deficits in adaptive skills, but bias potentially infected these tests, and the State effectively attacked the Vineland testing methodology. The State conducted an adult version of the Vineland, which showed that Grell had average adaptive skills for someone his age, but the test was administered to members of the victim's family who had never met Grell before he turned eighteen and might have harbored ill feelings toward him. Because the results of each test are suspect, we afford them little weight in our review.

**¶21** In the 2009 hearing, Grell also presented the testimony of Dr. Denis Keyes, a well-known educational psychologist who specializes in educating children with mental retardation. Dr. Keyes has several decades of practical and academic experience working in the field of mental retardation and was involved in developing the definition of mental retardation adopted by the DSM. Like Dr. Cunningham, Dr. Keyes conducted an adaptive skills assessment and concluded that Grell's "adaptive behavior skills are very significantly underdeveloped, and strongly support the finding that he is unable to adapt to normally accepted adult social standards." Dr. Keyes' investigation revealed that Grell's family viewed Grell as "somewhat incapable of caring for many of his own needs, and unable to make informed decisions for his own welfare." He concluded that Grell's record confirmed his adaptive deficits, as illustrated by his lifelong inability "to conform his behavior to the expected standards of his social and same aged peers." He explained that Grell's impulsive behavior and constant acting out evidenced his lack of adaptive skills because learning to confront difficult or frustrating situations without reacting immediately is an adaptive behavior; Grell's long history of impulse control problems shows that he never developed that ability. Dr. Keyes' remaining conclusions were tied to either the Vineland test he administered or his interviews with Grell's family members, all

of which we largely discount. *See supra* note 5. Although Dr. Keyes relied in part on such information, his conclusions are nonetheless telling:

> Given the facts of Shawn's low intellectual functioning, his inability to learn from his mistakes, his reduced capacity in communication, socialization and self-help skills, and his significant history of special education, followed by failure and dropping out of school and, in the absence of significant parental support and guidance, his subsequent serious entanglement with the criminal justice system, it is clear at this point that Shawn Grell is a person who has mental retardation.

¶22    The State contends that Grell is not actually impulsive or deficient in adaptive skills because he can "behave when he wants to." It points to instances when Grell acted appropriately, albeit only for a short while, after being told he did not have any more chances. The State also relies on Grell's ability to hold jobs for short periods, his relationship with Kristen's mother, his willingness to stop using drugs so that he could see Kristen, and his extended good behavior during this litigation. This evidence, the State claims, is consistent with antisocial personality disorder, not adaptive behavior deficits and mental retardation.

¶23    But Grell's occasional ability to behave is not conclusive of his adaptive skills. Dr. Keyes and several other defense witnesses testified, without rebuttal by the State, that maladaptive behavior disorders, including antisocial personality

- 14 -

disorder, can coexist with mental retardation. Dr. Keyes explained that clinicians often overlook this fact and mistakenly attribute behavioral issues to personality disorders, without considering that adaptive skill deficits might be the underlying cause of the behavioral issues. Dr. Keyes also noted that people may have inflated their assessment of Grell's mental abilities because Grell is a handsome man who does not fit the physical stereotype of someone with mental retardation. Furthermore, several witnesses testified that people with mental retardation react positively to structured situations; they can learn behaviors after considerable repetition. Thus, Grell might have behaved for short periods because he was in highly structured situations.

¶24 In addition to presenting affirmative evidence in 2009 of adaptive skill deficits, Grell convincingly rebutted the State's case in a way that he did not do in 2005. The State's sole mental retardation expert throughout these proceedings has been Dr. Scialli, a board certified psychiatrist. He does not diagnose, treat, or educate those with mental retardation. In preparing for his testimony, he reviewed Grell's educational and correctional records and interviewed members of Grell's family.

¶25 Aside from the childhood Vineland test administered to Grell's mother and the false identity incident that Dr. Cunningham effectively discredited, *see supra* ¶ 20, Dr. Scialli

relied on an adaptive skills test called the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) that was administered to Grell after he committed the murder. The diagnostic report for the test indicated that people with Grell's response pattern generally suffer from some form of personality disorder. Based on his review, Dr. Scialli diagnosed Grell with antisocial personality disorder, alcohol intoxication, alcohol dependence, amphetamine abuse, cannabis abuse, learning disorders, and attention deficit-hyperactivity disorder ("ADHD"). But the report did not address mental retardation as a possible additional diagnosis.

¶26     In rejecting Grell's mental retardation claims in 2005, the trial court was more persuaded by the 2001 testimony of Dr. Scialli than by that of Drs. Globus and Wicks. Based on the extensive additional evidence presented in 2009, however, we find several reasons to reach a different conclusion.

¶27     First, in 2009, Dr. Scialli acknowledged that, as a psychiatrist, he was not regularly involved in the clinical diagnosis of mental retardation and was not qualified to administer the tests commonly used to diagnose mental retardation. And unlike Drs. Keyes and Cunningham, who have both published extensively concerning mental retardation in peer-reviewed journals, Dr. Scialli has never published a peer-reviewed article on mental retardation issues.

¶28 Second, in 2009, Dr. Scialli initially testified that he "didn't see any evidence" in Grell's records that Grell's schools considered adaptive skills when diagnosing him with mental retardation. But he later acknowledged that the records include several notes specifically referring to Grell's adaptive skills and the Vineland test the school administered to gauge those skills.

¶29 Third, Dr. Scialli testified that he focused on Grell's *current* functioning — not, as the statute requires, on significant impairment that manifested itself "before the defendant reached the age of eighteen," A.R.S. § 13-753(K)(3) — and some of Scialli's conclusions depended on interviews with people who knew Grell only after he reached adulthood.

¶30 Fourth, the MMPI-2 test upon which Dr. Scialli relied was unreliable. The record suggests that Grell might not have had adequate time or lacked the intellectual functioning to comprehend the test. To overcome this deficit, the administrator read the questions to Grell, even though subjects are supposed to take the test on their own.

¶31 Finally, Dr. Scialli conceded that antisocial personality disorder and mental retardation are not mutually exclusive diagnoses. In other words, his opinion that Grell has antisocial personality disorder, alcohol intoxication, alcoholism, ADHD, and other conditions, is not inconsistent with

Grell also having mental retardation. In sum, ample evidence in the 2009 record causes us to question Dr. Scialli's conclusions.

¶32        In contrast, the State did not question Dr. Cunningham's professional experience or undermine his analysis, opinions, or credibility. Dr. Keyes, at times, appeared to act as an advocate. We therefore find Dr. Cunningham's opinions on Grell's adaptive behavior more persuasive, but nonetheless give Dr. Keyes' testimony some weight, given Dr. Keyes' experience and reputation in the mental retardation field.

¶33        Moreover, we find nothing in the school records or the testimony of school employees that casts doubt on their conclusions that Grell had mental retardation when the administrators and teachers dealt with him as a child. Indeed, the records reflect that Grell suffered deficits in several categories that the State's expert admitted were relevant to the adaptive skills inquiry, including the ability to socialize with peers and classmates, the ability to make friends, and the ability to use the bathroom independently.

¶34        Grell's extensive educational, medical, and criminal history shows consistent observations and documentation of his social and adaptive deficiencies since his early childhood. Throughout his life, Grell threw tantrums, got into fights, ditched school, ran away from home and treatment centers, committed crimes, tormented young children and the elderly, and

could not hold jobs. Those who interacted with Grell identified him at a very young age as someone who had an intellectual disability and described him as "deficient in the ability to establish a normal degree of affection, empathy or bond with the others," as having "a significant degree of callousness regarding the feelings of others," and as "functioning very immaturely and distrustfully," with "very poor" overall adaptive functioning. Such a mental health history, by itself, provides strong evidence that Grell suffered a "significant impairment" in the ability to "meet[] the standards of personal independence and social responsibility expected" of him. A.R.S. § 13-753(K)(1), (3).

**¶35** The record also contains some indications of Grell's limited ability to adapt. Although this evidence makes our decision difficult, a diagnosis of mental retardation, as statutorily defined, does not require a complete absence of adaptive skills. Viewed in its entirety, the record before us demonstrates an individual with "significant impairment" in "the effectiveness or degree to which [he] meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." *Id.* Grell has proved by a preponderance of the evidence that he has a disorder involving "significantly subaverage general intellectual functioning" coupled with significant deficits in adaptive behavior that

manifested before age eighteen, and thus that he has mental retardation.

### C.    Propriety of the Death Sentence

¶36    In light of Grell's mental retardation, our decision on the propriety of the death sentence is controlled by the Supreme Court's opinion in *Atkins*, which unequivocally prohibits states from executing defendants with mental retardation because to do so would constitute cruel and unusual punishment in violation of the Eighth Amendment.  536 U.S. at 321.  As the Supreme Court explained, such persons' moral culpability is constitutionally significantly reduced:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.  Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.  There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 318.  The foregoing accurately describes Grell. Certainly, at some level, Grell knew the difference between right and wrong, but the record is replete with examples of his inability, in keeping with his mental age, to understand and

process information, to communicate effectively, to reason abstractly and learn from mistakes or experiences, and to control his actions.

### III.  CONCLUSION

**¶37**    We are fully aware of the horrific nature of this crime and the devastation it has brought upon Kristen's family.  But given the recognition under our Constitution that defendants with mental retardation are less morally culpable for their crimes, we conclude that under the Supreme Court's ruling in *Atkins*, Grell is ineligible for execution.  We therefore vacate the trial court's death sentence and impose a sentence of natural life in prison.[6]

_____
Rebecca White Berch, Chief Justice

CONCURRING:

_____
Scott Bales, Vice Chief Justice

_____
A. John Pelander, Justice

_____
[6]    In light of this disposition, we do not list the issues Grell raised on appeal to avoid preclusion.

_____

Robert M. Brutinel, Justice




_____

Ann A. Scott Timmer, Justice*



     *Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Ann A. Scott Timmer, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter. Since this case was argued, Judge Timmer was appointed by Governor Janice K. Brewer as a Justice of the Arizona Supreme Court.



**B A L E S**, Vice Chief Justice, Concurring

**¶38** Applying independent review, the Court concludes that Grell has established by a preponderance of the evidence that he has mental retardation, _supra_ ¶ 35, and therefore he cannot be sentenced to death. _Id._ at ¶ 36. Because the federal constitution does not allow states to execute defendants who prove by a preponderance that they have mental retardation, _see Grell II_, 212 Ariz. at 530 ¶ 70, 135 P.3d at 710 (2006) (Bales, J., concurring in part and dissenting in part), I concur in the Court's opinion sentencing Grell to natural life in prison.

**¶39** Two other issues merit brief comment. Arizona statutes contemplate that the trial court will determine pretrial whether a defendant has mental retardation (now "intellectual disability"). _See_ A.R.S. § 13-753. Here, the trial court ruled

in 2005, based on evidence presented in 2001, that Grell had not shown mental retardation. At the end of the penalty phase in 2009, the trial court denied Grell's motion to enter a judgment finding that he has mental retardation, reasoning that it had no procedural means to revisit the issue it had decided in 2005. But as the Court notes, *supra* ¶ 26, "extensive additional evidence" on the retardation issue was presented at the 2009 trial. Such evidence could have provided good cause for the trial court to reconsider its pretrial determination. *See* Ariz. R. Crim. P. 16.1(d) (impliedly permitting courts to reconsider pretrial determinations upon finding of good cause).

**¶40** Our independent review in this case makes it unnecessary to address some potentially difficult issues in applying A.R.S. § 13-753 to murders occurring after August 1, 2002. The statute contemplates that the trial court will apply a clear and convincing standard of proof to the pretrial screening determination on mental retardation. A.R.S. § 13-753(G). If the trial court concludes that the defendant has not met this burden, the defendant may present evidence of mental retardation during the penalty phase. *Id.* § 13-753(F).

**¶41** Section 13-753, originally enacted before the United States Supreme Court decided *Atkins*, does not by its terms require either the trial court or the jury to consider if a defendant has shown, by a preponderance of the evidence, that he

- 23 -

has mental retardation as a bar to execution. Yet the Court's decision today recognizes that a finding of mental retardation by a preponderance precludes a death sentence. *See supra* ¶¶ 35, 36. In cases not subject to independent review (i.e., those involving murders committed after August 1, 2002), courts will need to address how to assure that a fact finder (whether the trial court or the jury) considers whether a defendant has proved mental retardation by a preponderance standard. These issues might, of course, also be subject to legislative action, as *Atkins* affords states flexibility in identifying procedures to implement the Constitution's proscription on executing defendants who have mental retardation. *See* 536 U.S. at 531; *Commonwealth v. Sanchez*, 36 A.3d 24, 60-61 (Pa. 2011) (discussing different approaches states have taken to determination of mental retardation).

_____

Scott Bales, Vice Chief Justice