IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JESSE JOHNSON, *Appellant*,

*v.*

ARIZONA DEPARTMENT OF ECONOMIC SECURITY, an agency,

and,

DES/DDD, *Appellees*.

No. 1 CA-UB 18-0105
FILED 7-9-2019

Appeal from the A.D.E.S. Appeals Board
No. P-1561522-001-B

**VACATED AND REMANDED**

COUNSEL

Lewis Roca Rothgerber Christie LLP, Phoenix
By Justin J. Henderson
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellee Arizona Department of Economic Security*

---

**OPINION**

Presiding Judge Paul J. McMurdie delivered the opinion of the Court, in which Chief Judge Peter B. Swann and Judge Diane M. Johnsen joined.

---

**M c M U R D I E**, Judge:

¶1        Jesse Johnson appeals the Arizona Department of Economic Security's ("Department") decision denying his application for services from the Division of Developmental Disabilities ("DDD services"), and the Department has conceded possible error. We hold that to be eligible for DDD services, Arizona Revised Statutes ("A.R.S") section 36-551(19) requires that a disability *manifest* before a claimant turns 18, not that the disability be *diagnosed* before that time. We further hold that regardless of the origin of the impairment, a claimant need only prove a cognitive disability as defined by A.R.S. § 36-551(14). Thus, we vacate the Department's decision and remand for a determination of the DDD services that Johnson is eligible to receive.

**FACTS AND PROCEDURAL BACKGROUND**

¶2        Johnson is 39 years old and has suffered from severe medical and behavioral problems for more than 20 years. Beginning in his mid-teens, Johnson experienced several behavioral changes, marked by social withdrawal, depression, and disorganized thinking, including signs of a thought disorder. His grade-point average dropped significantly, and he never finished high school. Johnson has seen little to no improvement over the last 23 years and struggles to complete daily functions without supervision, including showering, cooking, cleaning, paying bills, and checking for mail.

¶3        In 2000, at 20 years old, Johnson underwent his first neuropsychological evaluation. Testing by Dr. James Youngjohn revealed a full-scale IQ of 59, and the neuropsychologist opined Johnson most likely suffered from schizophrenia. Dr. Youngjohn, however, also opined that "[a]nother possibility would be some form of neurologic disease such as some form of post encephalitic condition or perhaps some form of post toxic/metabolic encephalopathy." Later assessments showed Johnson's IQ remained low. It was measured at 70 in 2002 and 63 in 2015. Over the years,

several doctors continued to report that Johnson likely suffered from multiple disorders that limited his life functions.

¶4        For example, in 2002, Dr. Youngjohn reaffirmed his conclusions of two years before. Also in 2002, Dr. Robert Crago, a licensed psychologist, evaluated Johnson and determined that he "presents with a significant and disabling symptom pattern," and "[m]ost prominent of his symptomatology are significant changes in his cognitive skills and emotional regulation." Dr. Crago reported:

> Mr. Johnson's current clinical presentation suggests a mixed etiology. That is, by history he appeared to suffer some type of mental and emotional breakdown at age 16 involving a depressed mood with social withdrawal and even perhaps some psychotic features. However, upon being exposed to toxic mold his condition greatly worsened and the clinical picture became somewhat confused. I believe he was probably manifesting some signs of toxic encephalopathy confusing his emotional presentation.

¶5        In 2015, psychologist Dr. Raymond Lemberg evaluated Johnson and diagnosed him with: (1) mild neurocognitive disorder, with behavioral disturbance, due to traumatic brain injury; (2) mild neurocognitive disorder, due to another medical condition, i.e., mold exposure; and (3) schizoaffective disorder, by history. He reported Johnson "needs a great deal of help managing activities of daily living, as [his] mother visits him daily to assist him with these activities." One year later, psychologist Dr. Karen Sullivan examined Johnson and diagnosed him with neurocognitive disorder due to multiple etiologies and with schizoaffective versus schizophrenic disorder. She explained that after talking with Johnson's mother and reviewing the file, "it does appear that Mr. Johnson is unable to take care of his daily and essential activities without the help of family and that he will need ongoing support and care."

¶6        Johnson applied for DDD services, and the Department issued a notice denying eligibility in November 2015. After administrative review, the Department determined Johnson was ineligible for DDD services in part because he did not have a qualifying diagnosis before the age of 18. Johnson appealed the determination, and a hearing was held before an Administrative Law Judge ("ALJ").

¶7        At the hearing, Dr. Michael Gray, one of Johnson's treating physicians, testified he diagnosed Johnson with mixed mold mycotoxicosis.

When asked whether he had "an opinion within a reasonable degree of medical certainty as to whether . . . [the] mold exposure [he] treated Jesse Johnson for had any effect on his neurocognitive functioning," Dr. Gray responded: "Yes. . . . He was compromised by the presence of the toxins and he remains compromised as a result of that . . . ." Dr. Gray testified Johnson "demonstrated neurocognitive decline . . . [and] was really compromised. His memory was compromised. His ability to think clearly and focus was compromised." Dr. Lemberg also testified he had diagnosed Johnson with neurocognitive disorder due to multiple etiologies. He testified "it's been 20 years since [Johnson] began to show dysfunction and . . . [he has] deteriorated over time . . . [and] just has very limited functioning. I do not believe that he is going to get better in any significant way."

¶8        The Division of Developmental Disabilities' medical director, Dr. Pamela Tom, a medical doctor, testified for the Department. She testified she did not believe there was evidence that toxic chemicals produced by mold can cause human illness, and that Johnson's symptoms "appear[ed] to [her] to be either schizoaffective disorder or schizophrenia." However, she agreed Johnson demonstrated a "sharp drop in cognitive functioning" that manifested before he turned 18 years old and that Johnson is likely not "able to function independently in activities of basic daily living."

¶9        After the hearing, the ALJ affirmed the denial of services. The ALJ found the evidence failed to show "that any developmental disability was a severe chronic disability attributable to cognitive disability; manifested before age 18; and [was] likely to continue indefinitely." *See* A.R.S. § 36-551(19).

¶10        Johnson petitioned the Department's Appeals Board to review the ALJ's decision. The Appeals Board found Johnson had substantial limitations in at least three areas of major life activity and that his condition was likely to continue indefinitely. It also found "the evidence clearly establishe[d] that [Johnson] has subaverage intellectual functioning." But the board "reject[ed] [Johnson's] arguments concerning the existence of a cognitive disability that manifested itself before the age of 18." The Appeals Board noted Johnson had presented no IQ test results or medical records predating his 18th birthday and explained, "[g]iven the lack of a consistent medical diagnosis and the lack of any diagnosis before [Johnson's] 18th birthday, we find it impossible to determine the cause of [Johnson's] cognitive deficits." The Appeals Board affirmed the ALJ's decision.

4

¶11        Johnson timely applied for an appeal with this court. This court granted the application for an appeal. We have jurisdiction under A.R.S. § 41-1993(B).

**DISCUSSION**

¶12        "We view the evidence in the light most favorable to upholding the Appeals Board's decision and will affirm if the decision is supported by substantial evidence." *Rios Moreno v. ADES*, 178 Ariz. 365, 367 (App. 1994). We defer to the Appeals Board's findings of fact unless they are arbitrary, capricious, or an abuse of discretion. *Figueroa v. ADES*, 227 Ariz. 548, 550, ¶ 9 (App. 2011). "However, legal conclusions of the appeals board are not binding on this court; we are free to draw our own legal conclusions in determining if the appeals board properly interpreted the law." *Munguia v. ADES*, 159 Ariz. 157, 159 (App. 1988). It is an abuse of discretion to misapply the law. *Rios Moreno*, 178 Ariz. at 367.

¶13        Johnson asserts the Appeals Board denied him eligibility for services because he did not have a diagnosis before he turned 18 years old. He argues a claimant need not show a qualifying diagnosis before age 18, or the cause of the disability, but only needs to establish that a disability manifested before the claimant's 18th birthday. Johnson contends that the record shows his disability manifested before his 18th birthday and he is, therefore, entitled to DDD services.

**A.        A Claimant Does Not Have to Receive a Diagnosis Before Turning 18 Years Old to be Eligible for DDD Services.**

¶14        By statute, to be eligible to apply for DDD services, a person must be an Arizona resident and "provide[] medical and psychological documentation of [a] developmental disability utilizing tests which are culturally appropriate and valid." A.R.S. § 36-559(A). The statute defines a developmental disability as a "severe, chronic disability that":

(a)        Is attributable to cognitive disability . . . .

(b)        Is manifested before the age of eighteen.

(c)        Is likely to continue indefinitely.

(d)        Results in substantial functional limitations in three or more areas of major life activity [defined in (d)(i)–(vii)].

\*        \*        \*

(e)    Reflects the need for a combination and sequence of individually planned or coordinated special, interdisciplinary or generic care, treatment or other services that are of lifelong or extended duration.[1]

A.R.S. § 36-551(19). A "cognitive disability" is "a condition that involves subaverage general intellectual functioning, that exists concurrently with deficits in adaptive behavior manifested before the age of eighteen and that is sometimes referred to as intellectual disability." A.R.S. § 36-551(14).

¶15    On appeal, the Department agrees with Johnson that A.R.S. § 36-551(19) does not require a claimant to have obtained a diagnosis before turning 18 years old as it only requires the developmental disability to manifest before then. The Department further concedes the Appeals Board "may have erred by applying an incorrect standard" when it determined Johnson's eligibility, and asks this court to vacate the Appeals Board's decision and remand for reconsideration. We agree with both parties that a claimant need not be diagnosed with the disability before turning 18 years old to be eligible for DDD services, and we hold the Appeals Board erred by relying on the fact that Johnson was not diagnosed before he turned 18 years old.

¶16    "'Manifested before the age of eighteen' means that the disability must be apparent and have a substantially limiting effect on a person's functioning before the age of eighteen." A.R.S. § 36-551(32). Read together, the plain language of A.R.S. § 36-551(19) and (32) requires only that the disability manifest, or become apparent, before the person turns 18, not that it be diagnosed before that time. *See Chaparral Dev. v. RMED Int'l., Inc.*, 170 Ariz. 309, 311 (App. 1991) (if a statute's "language is plain and unambiguous, then no construction is necessary and our duty is simply to apply that plain and unambiguous language"). We will not require that a person be diagnosed before turning eighteen when no such requirement is found within the statute. *See Cicoria v. Cole*, 222 Ariz. 428, 431, ¶ 15 (App. 2009) ("Courts will not read into a statute something that is not within the manifest intent of the legislature as indicated by the statute itself . . . ."). Thus, the Appeals Board erred to the extent it denied Johnson's application because Johnson was not diagnosed before his 18th birthday. *See Williams v. Cahill ex rel. County of Pima*, 232 Ariz. 221, 228, ¶ 25 (App. 2013) ("[W]here a defendant's intellectual and adaptive functioning were not tested when

---

[1]    Whether Johnson's disability meets the criteria of A.R.S. § 36-551(19)(e) is not in dispute.

he was a child, or where such test results are unavailable, a trial court must consider whether inferences from other evidence establish that the onset of concurrent deficits in these areas, sufficient to meet statutory requirements, occurred before the defendant reached the age of eighteen." (construing A.R.S. § 13-753's definition of "intellectual disability")).

¶17　　　Although the Department asks us to remand for further fact-finding, there is no dispute in the record that Johnson's "condition" *manifested* before he turned 18 years old. As stated by the Appeals Board:

> There is ample evidence that [Johnson] began to display significant changes in his behavior, personality and general functioning at the age of 15. During the period before his 18th birthday, [Johnson] earned failing grades, dropped out of school, withdrew from social activities, and due to his behavior he was asked to no longer reside in his mother's house on more than one occasion.

Johnson's mother testified her son experienced significant and substantial behavioral, social, and academic changes before he turned 18 years old. Moreover, the Department's witness agreed that regardless of Johnson's diagnosis, his symptoms manifested before he turned 18 years old and "reflected a sharp drop in cognitive functioning." Thus, even though his cognitive disability was not diagnosed before Johnson's 18th birthday, he established his condition manifested before that date.

## B.　Johnson has a "Developmental Disability" and is Eligible for DDD Services.

¶18　　　The Appeals Board recognized Johnson suffers from a cognitive deficit. The board also expressly agreed that Johnson's "condition is likely to continue indefinitely and that he has substantial limitations in at least three areas of major life activity." Thus, as a matter of law, Johnson has a "developmental disability" as defined by A.R.S. § 36-551(19).

¶19　　　The Department, however, argues this case should be remanded for reconsideration in light of the appropriate standard of review, which it asserts is whether Johnson suffers "from a *qualifying diagnosis* that . . . manifested before age eighteen." (Emphasis added.) As the Appeals Board found, the Department maintains that a cognitive deficit caused in part by a claimant's mental illness would not qualify for DDD services. Johnson counters that the statute does not require him to prove he had a "qualifying diagnosis" or the cause of his cognitive disability.

¶20 Beyond erroneously requiring a diagnosis before Johnson's 18th birthday, the Appeals Board concluded he was not eligible for DDD services because it could not determine the cause of his disability. After laying out the "ample evidence" that Johnson began displaying "significant changes in his behavior, personality and general functioning at the age of 15," the Appeals Board found:

> The record reveals that there are a variety of factors which, alone or in combination, could have contributed to the change in [Johnson]. [Johnson's] father died when [he] was 15 years old. He was exposed to toxic mold while on a school trip and in his own home. He experienced several blows to the head. He used marijuana and possibly other drugs. Because no medical records were submitted for the period before [Johnson's] 18th birthday, *it is impossible to determine the cause of [Johnson's] cognitive deficits and whether that cause began to affect [Johnson] before his 18th birthday.*

(Emphasis added.) The board went on to recount the contradicting medical evidence regarding the origin of Johnson's issues—whether he suffered from a psychiatric disorder, an illness due to mold exposure, a brain injury, or some combination of those—and concluded "[g]iven the lack of a consistent medical diagnosis and the lack of any diagnosis before [Johnson's] 18th birthday, *we find it impossible to determine the cause of [Johnson's] cognitive deficits.*" (Emphasis added.)

¶21 The statutes governing eligibility for DDD services do not, however, require a claimant to establish the cause of the disability. "If a statute's language is clear and unambiguous . . . we apply it as written without resorting to other methods of statutory interpretation." *State v. Kemmish*, 244 Ariz. 314, 316, ¶ 10 (App. 2018). As stated above, we will not engraft a requirement onto a statute that the legislature did not see fit to include. *Cicoria*, 222 Ariz. at 431, ¶ 15.

¶22 Although a claimant must provide documentation of a developmental disability, A.R.S § 36-559(A)(2), the statute defining "cognitive disability" makes no mention of the cause of the disability. Instead, it defines the term solely with respect to the existence of the disabling condition: If a claimant's condition "involves subaverage general intellectual functioning, that exists concurrently with deficits in adaptive behavior manifested before the age of eighteen," A.R.S. § 36-551(14), he or she has a "cognitive disability" for DDD services eligibility. If the legislature intended to allow services only to persons who can show a

cognitive disability from specific causes, it could have done so. *See Padilla v. Indus. Comm'n*, 113 Ariz. 104, 106 (1976) (a fundamental principle of statutory construction is that "what the Legislature means, it will say"); *cf.* A.R.S. § 36-551(10) (defining "cerebral palsy" as "a permanently disabling condition *resulting from damage to the developing brain* that may occur before, after or during birth and that results in loss or impairment of control over voluntary muscles") (emphasis added).

¶23        The Department argues that the Diagnostic and Statistical Manual of Mental Disorders ("DSM") and the commonly accepted diagnoses of intellectual or cognitive disability do not include cognitive impairments caused by psychiatric conditions.[2] Even if the Department's assertion is true, the legislature chose not to reference the DSM or otherwise specify that the mental health community's standard definition would limit eligibility for DDD services for a claimant who is cognitively disabled. The legislature included the phrase "and that is *sometimes* referred to as intellectual disability" after its given definition of "cognitive disability." *See*

_____

[2]        Courts have recognized that intellectual disability and mental illness are sometimes conflated. *See State v. Grell*, 231 Ariz. 153, 158–60, ¶¶ 23–35 (2013) (summarizing expert witness testimony that personality disorders can coexist with intellectual disability and noting defendant's mental health history "provides strong evidence" that he suffered a significant impairment in his adaptive behavior); *Lambert v. State*, 126 P.3d 646, 651, 659, ¶¶ 6, 31 (Okla. Crim. App. 2005) (defendant not required to show that intellectual disability is the cause of limitations in adaptive functioning and noting "[it] is possible to be mentally retarded and mentally ill. [Defendant] has not claimed to be mentally ill, and [the state's offered] evidence of mental problems did not make the issue of his mental retardation more or less likely"); *Coleman v. State*, 341 S.W.3d 221, 250–52 (Tenn. 2011) (discussing the potential problems with determining the cause of a cognitive disability when an individual presents with dual diagnoses of intellectual disability and mental illness); *see also* Steven J. Mulroy, *Execution by Accident: Evidentiary and Constitutional Problems with the "Childhood Onset" Requirement in Atkins Claims*, 37 Vt. L. Rev. 591, 614 (2013) ("[T]he widely shared opinion of medical experts [is] that [intellectual disability] and other psychological disorders are often interwoven, making it impossible to untangle one from another as the cause of observed cognitive and adaptive deficits."). The soundness of requiring an individual to establish the cause of a cognitive disability is not before this court, but this case illustrates the potential problem of requiring a claimant to prove that a mental illness did not cause the cognitive disability.

A.R.S. § 36-551(14) (emphasis added). But even assuming that phrase is a reference to the DSM or the mental health community's definitions, so long as a claimant meets the first two elements of A.R.S. § 36-551(14)'s definition, he or she has a "cognitive disability." That the presentation of symptoms may *sometimes* be the result of a condition that is "referred to as intellectual disability" by the mental health community does not mean that the statute adopted the DSM's definition of the phrase.[3]

¶24        The Appeals Board recognized Johnson has a "cognitive deficit." The Department maintains there is a distinction—based on the cause of the condition—between having a cognitive impairment and having a cognitive disability as defined by A.R.S. § 36-551(14). The Appeals Board's decision, however, implicitly found that Johnson established every element of the statutory definition of cognitive disability. The board found the evidence established Johnson had subaverage intellectual functioning. It also found "the record is replete with evidence of [Johnson's] inability to handle even simple tasks" and noted that "the Department's own witness opined that [Johnson's] condition made it impossible for [him] to function independently." *See* A.R.S. § 36-551(14). Thus, the Appeals Board's findings, which are supported by the record, establish that Johnson has a "cognitive disability" qualifying him for DDD services. The Appeals Board erred by holding otherwise, and we remand for a determination of the services Johnson is eligible to receive.

¶25        We note that Arizona Administrative Code ("A.A.C.") R6-6-303(A)(4), which became effective August 24, 2018, details the type of "cognitive/intellectual disability" diagnosis the Department "shall" accept to determine eligibility for DDD services. Under the regulation, the evaluating psychologist must consider other mental disorders when making the diagnosis and "[t]o be eligible for the program, in the presence of co-existing mental illness, an individual's cognitive/intellectual disability *shall not be the result of the onset of mental illness.*" A.A.C. R6-6-303(A)(4)(a)–(b) (emphasis added). Although A.A.C. R6-6-303 was not in effect when Johnson applied for DDD services or when the Appeals

---

3        We also note that A.R.S. § 36-551(6) defines "[a]ttributable to cognitive disability [as] a causal relationship between the presence of *an* impairing condition and the developmental disability." (Emphasis added.) The legislature's choice to again not require a specific "impairing condition" to cause a developmental disability further supports the conclusion that a claimant need not establish the cause of a cognitive disability.

Board made its determination, the Department's witness testified that the Department's policy at that time was that "intellectual disability must precede and be documented prior to any onset of psychiatric or psychological disorder." An agency "must exercise its rule-making authority within the parameters of its statutory grant," *Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co.*, 177 Ariz. 526, 530 (1994), and it is without power to enact a regulation that conflicts with a statute, *Sharpe v. Ariz. Health Care Cost Containment Sys.*, 220 Ariz. 488, 494–95, ¶¶ 18–19 (App. 2009) (determining whether an administrative rule and agency policy "unlawfully restrict[ed] the statutory grant of coverage"); *see also Freelance Interpreting Servs., Inc. v. ADES*, 212 Ariz. 457, 461, ¶ 26 (App. 2006) (an administrative rule that diminishes the rights in an enabling statute is not valid); *Ariz. Health Care Cost Containment Sys. Admin. v. Carondelet Health Sys.*, 188 Ariz. 266, 270 (App. 1996) (agency rule was invalid because it denied medical coverage "for an entire group of patients who would otherwise be covered"). Although the Department acknowledged at oral argument that the new regulation would not apply to Johnson's application, given our holding today that under A.R.S. § 36-551(14) and (19), a claimant need not establish a qualifying diagnosis or the cause of his or her cognitive disability to be eligible for DDD services, the validity of the regulation is open to challenge in another case.

## ATTORNEY'S FEES AND COSTS

¶26        Johnson requests attorney's fees, expert witness fees, and costs incurred on appeal and in the administrative proceedings below under A.R.S. § 12-348(A)(2) and (I)(1). In relevant part, A.R.S. § 12-348 provides:

> (A)(2) In addition to any costs that are awarded as prescribed by statute, a court shall award fees and other expenses to any party other than this state . . . that prevails by an adjudication on the merits in . . . [a] court proceeding to review a state agency decision pursuant to chapter 7, article 6 of this title or any other statute authorizing judicial review of agency . . . decisions.
>
> *        *        *
>
> (I)(1) "Fees and other expenses" means the reasonable expenses of expert witnesses . . . which the court finds to be directly related to and necessary for the presentation of the party's case and reasonable and necessary attorney fees, and

11

in the case of an action to review an agency decision pursuant to subsection A, paragraph 2 of this section, *all fees and other expenses that are incurred in the contested case proceedings in which the decision was rendered.*

(Emphasis added.)

¶27         The Department argues A.R.S. § 12-348(H)(1) precludes an award of attorney's fees to Johnson. That subpart of the statute excludes an award of attorney's fees in "an action arising from a proceeding before this state . . . in which the role of this state . . . was to determine the eligibility or entitlement of an individual to a monetary benefit or its equivalent." A.R.S. § 12-348(H)(1). We disagree because we conclude that the role of the Department in this case was not to determine Johnson's eligibility or entitlement to "a monetary benefit or its equivalent."

¶28         The DDD services a person may be entitled to are broader than a monetary benefit or its equivalent. *See Cortaro Water Users' Ass'n v. Steiner*, 148 Ariz. 314, 319 (1986) ("An example [of a monetary benefit or its equivalent] is where an applicant is seeking welfare payments or a disability pension payment."). The Department may provide an array of programs and services to individuals enrolled in the developmental disabilities program, including job-related services and programs, adult day activity services, residential services, therapy, medical, social development, transportation, and in-home services. A.R.S. § 36-558(C); *accord* A.A.C. R6-6-101(68) (defining "services" as "developmental disability programs and activities consistent with family support philosophy and operated by or contracted for the Department directly or indirectly, including residential services, family and child services, family and adult services, and case management and resource services").

¶29         Although the DDD services the Department provides to a claimant undoubtedly may have an economic impact, such impact is indirect. *See Cortaro*, 148 Ariz. at 319 ("If mere economic impact would exempt an award of fees pursuant to A.R.S. § 12-348, [most state agencies] would almost always be exempt from payment of attorneys' fees since most decisions have some economic impact."). This court has previously awarded attorney's fees in an appeal from a determination that a claimant was ineligible for DDD services under A.R.S. § 12-348(A)(2). *Cooke v. ADES*, 232 Ariz. 141, 145–46, ¶ 20 (App. 2013). Similarly, we have also awarded fees under the statute in an appeal from a denial by the Arizona Health Care Cost Containment System of a member's request to receive dentures, a service she was entitled to through her enrolled plan. *Sharpe*, 220 Ariz. at

491, 500, ¶¶ 2, 44. Thus, we conclude the DDD services Johnson is eligible for are not merely "a monetary benefit or its equivalent." We award Johnson his attorney's fees and other expenses incurred both on appeal and in the agency proceedings below, including costs under A.R.S. § 12-341, upon compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

¶30    For the foregoing reasons, we vacate and remand for a determination of the appropriate DDD services to be awarded to Johnson.



AMY M. WOOD • Clerk of the Court
FILED:   AA