OPINION

HOWARD, Chief Judge.
¶ 1 In this statutory special action, Roosevelt Williams challenges the respondent judge’s ruling that he failed to establish, by clear and convincing evidence, an intellectual disability rendering him ineligible for the death penalty in his pending prosecution for murder. Our consideration of the merits of Williams’s petition is mandatory. See A.R.S. § 13-753(1). For the following reasons, we deny relief.
Background
¶ 2 As a matter of statutory and constitutional law, a person convicted of a capital offense who suffers from an intellectual disability, previously known as mental retardation, may not be sentenced to death. § 13-753(H); Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (Eighth Amendment prohibits execution of mentally retarded persons).[1] Under § 13- *223 753(E)(3), an intellectual disability is defined as follows:
[A] condition based on a mental deficit that involves significantly subaverage general intellectual functioning, existing concurrently with significant impairment in adaptive behavior, where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen.
The statute further defines “[significantly sub-average general intellectual functioning” as “a full scale intelligence quotient of seventy or lower,” taking into account “the margin of error for the test administered.” § 13-753(E)(5). “ ‘Adaptive behavior’ ” is defined as “the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant’s age and cultural group.” § 13-753(E)(1).
¶ 3 Williams was indicted for two counts of first-degree murder, and the state filed a notice of its intent to seek the death penalty. In accordance with § 13-753(B), the respondent judge appointed a “prescreening psychological expert” to evaluate Williams’s intelligence quotient (IQ). Upon that expert’s report that Williams’s IQ test score was less than seventy-five, the respondent appointed additional experts and scheduled an eviden-tiary hearing to determine whether Williams suffers from an intellectual disability and therefore is ineligible for a death sentence. See § 13-753(D).
¶ 4 After the evidentiary hearing, the respondent judge found Williams had “met his burden of showing that, at least currently, he presents with significantly sub-average general intellectual functioning” based on “[t]wo valid IQ test scores” of sixty-eight and seventy and the neuropsychological assessment performed by defense expert James Sullivan.[2] But the respondent further found Williams had “not met his burden of showing that the mental impairment existed eoncur-rently with significant adaptive behavior impairment or that the onset of the conditions occurred before [he] reached the age of [eighteen].” Accordingly, the respondent denied Williams’s request to dismiss the state’s notice of its intent to seek the death penalty.
¶ 5 For the most part, Williams does not dispute the respondent judge’s thorough summary of the evidence presented at the hearing. Instead, he contends the respondent abused his discretion in applying § 13-753 “in such a manner that it violated the Eighth Amendment to the United States Constitution and article II § 15 of the Arizona Constitution.” But Williams does not articulate clearly the basis for a constitutional claim; instead, he challenges the respondent’s reliance on certain evidence and his rejection of other evidence in concluding Williams had failed to sustain his burden of proof. According to Williams, clear and convincing evidence not only established that he suffers from impairments in intellectual and adaptive functioning contemplated by § 13-753, but also established, as required, that the onset of these conditions occurred before the age of eighteen.
Discussion
¶ 6 At a hearing conducted in accordance with § 13-753, “the defendant has the burden of proving intellectual disability by clear and convincing evidence.” § 13-753(G); see also State v. Grell (Grell II), 212 Ariz. 516, ¶ 29, 135 P.3d 696, 702 (2006) (statute’s burden of proof requirements constitutionally permissible). We defer to the respondent judge’s factual findings if they “are supported by the record and not clearly erroneous.” State v. Rosengren, 199 Ariz. 112, ¶ 9, 14 P.3d 303, 307 (App.2000). Moreover, a trial judge “ ‘has broad discretion in determining the weight and credibility given to mental health evidence’” presented in an Atkins hearing. Grell II, 212 Ariz. 516, ¶ 58, *224 135 P.3d at 708, quoting State v. Doerr, 193 Ariz. 56, ¶ 64, 969 P.2d 1168, 1181 (1998). We review legal questions, including questions of constitutional law, de novo, id. ¶¶ 22, 55, but we will not upset a legal determination that evidence was insufficient to meet a clear and convincing standard unless we can say “as a matter of law that no one could reasonably find that the evidence ... was less than clear and convincing.” Groth v. Martel, 126 Ariz. 102, 103, 612 P.2d 1065, 1066 (App.1979); see also State v. West, 226 Ariz. 559, ¶ 15, 250 P.3d 1188, 1191 (2011) (“[Q]uestion of sufficiency of the evidence is one of law....”).
¶ 7 In Atkins, the United States Supreme Court held that executing a mentally retarded offender violates the Eighth Amendment’s ban on cruel and unusual punishment. 536 U.S. at 321, 122 S.Ct. 2242. The Court announced this categorical rule based on a “national consensus,” evinced by prohibitions enacted by state legislatures, that mentally retarded persons are “categorically less culpable than the average criminal” and more vulnerable to wrongful execution. Id. at 315-21, 122 S.Ct. 2242. According to the Court, “Mo the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded.” Id. at 317, 122 S.Ct. 2242.
¶8 The Court cited clinical definitions of mental retardation found in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-TV), published by the American Psychiatric Association (APA), and Mental Retardation: Definition, Classification, and Systems of Supports (9th ed. 1992), published by the American Association on Mental Retardation (AAMR),[3] stating that both definitions require evidence of “subaver-age intellectual functioning ... [and] significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age [eighteen].” [4] Id. at 318 & n. 3, 122 S.Ct. 2242. Adopting the approach it chose when it prohibited execution of offenders who are insane, the Court left “ ‘to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences,’ ” noting that “statutory definitions of mental retardation” in states that legislatively had prohibited execution “are not identical, but generally conform to the clinical definitions” promulgated by the APA and the AAMR. Id. at 317 & n. 22, 122 S.Ct. 2242, quoting Ford v. Wainwright, 477 U.S. 399, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (alterations in Atkins).
¶ 9 Arizona is among the states that had enacted legislation prohibiting the execution of mentally retarded offenders before Atkins was decided. Id. at 315, 122 S.Ct. 2242; State v. Grell (Grell I), 205 Ariz. 57, ¶ 38, 66 P.3d 1234, 1240 (2003); see also 2001 Ariz. Sess. Laws, ch. 260, § 2. As summarized by our supreme court,
[Section 13-753[4]
[5] ] involves several steps in which experts examine a capital defendant “using current community, nationally and culturally accepted physical, developmental, psychological and intelligence testing procedures, for the purpose of determining whether the defendant has mental *225 retardation.” The experts submit reports and the trial court holds a hearing at which the defendant bears the burden of proving mental retardation by clear and convincing evidence. A finding by the trial court of mental retardation prohibits the imposition of the death penalty.
Grell I, 205 Ariz. 57, ¶ 39, 66 P.3d at 1240, quoting § 13-753(E) (citations omitted). The court noted Arizona’s statute “appears to comport substantively and procedurally with the principles set forth in Atkins,” id. n. 4, and remanded the case for a determination of whether Grell, who had been sentenced before the statute took effect, was “mentally retarded and therefore ineligible to receive the death penalty” pursuant to constitutional principles announced by the Supreme Court in Atkins, id. ¶¶ 41-42.
¶ 10 In an appeal after remand, our supreme court affirmed the trial court’s finding that Grell had failed to establish mental retardation by clear and convincing evidence. Grell II, 212 Ariz. 516, ¶ 63, 135 P.3d at 709. The court rejected Grell’s arguments that § 13-753 is unconstitutional because it places the burden of proving mental retardation on the defendant; because it requires the defendant to prove mental retardation by clear and convincing evidence; or because it permits capital punishment in the absence of a jury finding, beyond a reasonable doubt, that the defendant is not mentally retarded. Id. ¶¶ 29, 41, 49.
¶ 11 Relevant to some of the issues Williams raises, Grell also had argued the trial court erred in finding the evidence insufficient to establish he had a significant impairment in adaptive behavior and asserted he had “clearly shown that [he] has deficits in two of the eleven areas listed in the [APA’s] DSM-IV and therefore has mental retardation.” Id. ¶ 62. Our supreme court explained,
The DSM-IV definition of mental retardation, ... while similar in overall meaning, is not the same as the statutory definition. The statute requires an overall assessment of the defendant’s ability to meet society’s expectations of him. It does not require a finding of mental retardation based solely on proof of specific deficits or deficits in only two areas.
Id. With this standard in mind, the court found the evidence was sufficient to “support a finding that Grell was able to function at a level higher than that of ‘significant impairment’ ” and concluded the trial court did not clearly err in finding Grell had “failed to prove mental retardation by clear and convincing evidence.” Id. ¶ 63. The court also found Grell was entitled to be resentenced by a jury, pursuant to the Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 589, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and remanded the case for that proceeding. Id. ¶¶ 64-67.
¶ 12 On remand, a jury imposed the death penalty, and Grell’s case was returned to our supreme court on automatic appeal, pursuant to A.R.S. § 13-755(A). State v. Grell (Grell III), 231 Ariz. 153, ¶ 1, 291 P.3d 350, 351 (2013). The court “independently reviewed] the propriety of the death sentence,”[6] considered whether Grell had established mental retardation in the penalty phase of his resen-tencing hearing, and concluded, “Grell is not *226 subject to the death penalty by reason of mental retardation.” Id. ¶¶ 3-4,10.
¶ 13 The court emphasized in Grell III that its “inquiry differed]” from the questions raised in Grell II, in which it had deferred to the trial court’s determination “that Grell had not proved by clear and convincing evidence that he had significant deficits in adaptive behavior” because “ ‘[reasonable minds [could] differ as to how to interpret the evidence presented.’ ” Id. ¶¶ 9-10, quoting Grell II, 212 Ariz. 516, ¶ 63, 135 P.3d at 709 (alteration in Grell III). In contrast to its inquiry in Grell II, the court explained it was required in Grell III to “independently review the evidence presented in the 2009 resentencing,” without deference to the jury’s findings or decisions, “to determine whether Grell proved mental retardation by a preponderance of the evidence.” Id. ¶ 10. The court further noted its determination in Grell III had been based on a preponderance of the evidence — a “less demanding” standard of proof “than the clear and convincing evidence standard” employed in Grell II and “required for a pre-trial finding,” pursuant to § 13-753(G), “that mental retardation barred imposition of the death penalty.” Id. Finally, the court observed that Grell had presented “substantially more — and more convincing— evidence of adaptive skill deficits” at his 2009 resentencing hearing than he had presented at the 2005 hearing held on the sole issue of whether he was mentally retarded and therefore ineligible for a death sentence. Id. ¶ 11.
¶ 14 Like the court in Grell II, our review is limited to whether the respondent judge “clearly err[ed]” in concluding Williams faded to prove an intellectual disability by clear and convincing evidence, and we must defer to the respondent’s determination if “reasonably supported by evidence.” Grell II, 212 Ariz. 516, ¶ 63, 135 P.3d at 709; see also Book Cellar, Inc. v. City of Phx., 139 Ariz. 332, 335, 678 P.2d 517, 520 (App.1983) (in review by special action, court does not weigh evidence but determines whether sufficient evidence supported decision and whether trial court properly exercised discretion).
¶ 15 Here, three experts testified at the Atkins evidentiary hearing: Neuropsyehologist James Sullivan testified for the defense on the issue of Williams’s cognitive function, and, on the issue of Williams’s adaptive behavior, psychologist Ricardo Weinstein testified for the defense and psychologist Sergio Martinez testified for the state. Each of these experts also provided a written report summarizing his evaluation and conclusions. Sullivan concluded “beyond a reasonable psychological certainty” that Williams presently “has pronounced and authentic neuropsycho-logical and psychiatric impairment.” He offered no similarly confident conclusion regarding the etiology of these impairments or whether Williams met other clinical or statutory criteria for an intellectual disability, but found it “quite likely” that Williams’s “documented cerebral dysfunction ... is a direct result of prenatal insult,” such as his mother’s substance abuse during pregnancy, “as well as exposure to severe childhood psychological trauma in the form of physical and sexual abuse.” Weinstein concluded Williams “fulfills the definitions of Intellectual Disabilities (Mental Retardation) contained in ... § 13-753(K) as well as the ones contained in the DSM-IV ... and [promulgated by] the AAIDD.” Martinez concluded Williams “does not meet the criteria” in § 13-753(K)(3), finding “no evidence” to demonstrate that “he experienced significantly subaverage general intellectual functioning along with significant impairment in adaptive functioning” before the age of eighteen.
¶ 16 In the order under review, the respondent judge correctly identified the “determinative issues” as “whether there is sufficient evidence that [Williams’s] intellectual functioning was significantly sub-average and whether his ‘adaptive behavior’ was significantly impaired, and if so, whether the evidence is clear and convincing that he suffered from [these conditions] before the age of [eighteen].”
¶ 17 With respect to intellectual functioning, the respondent judge found “[Williams’s] current intelligence quotient is below [seventy], ‘significantly sub-average.’ However, his IQ likely was higher [twenty] years ago, at age [eighteen]. The current level ‘absolutely,’ as Dr. Sullivan put it, is lower because of [Williams’s] drug and alcohol abuse and worsening mental illness.” Similarly, the re *227 spondent found, “[Williams] does present now with ‘significantly impaired function’ as shown by Dr. Sullivan’s recent neuropsycho-logical testing,” but “the evidence does not support a finding that, as the governing statute mandates, there is ‘clear and convincing evidence’ that [Williams’s] adaptive behavior was affected” by this intellectual deficiency, either before or after the age of eighteen.
¶ 18 To establish an intellectual disability under § 13-753, Williams was required to show by clear and convincing evidence that he suffered “the onset of an IQ [of seventy or] below ... before the age of [eighteen].” Moormann v. Schriro, 672 F.3d 644, 648-49 (9th Cir.2012) (Arizona Supreme Court’s denial of stay of execution, where defendant’s offer of proof pertained to declining IQ as adult post-conviction, not contrary to or unreasonable application of clearly established federal law); see also State v. Arellano, 213 Ariz. 474, ¶ 21, 143 P.3d 1015, 1021 (2006) (“The provision [in § 13-753] requiring that symptoms of mental retardation occur before age eighteen applies to both elements of mental retardation: significantly subaverage intelligence and significantly impaired adaptive behavior.”). Sullivan reported Williams’s full scale IQ currently is seventy, “consistent with borderline overall function” and on the cusp of Arizona’s definition of the “[significantly subaverage general intellectual functioning” required to establish an intellectual disability pursuant to § 13-753(K)(3) and (5).
¶ 19 Although Sullivan stated Williams’s reported substance abuse and mental illness as an adult, considered either alone or in combination, could not account for the full extent of impairments Sullivan found during neuropsychological tests, he also testified there was “no question that these two things combined together [have] lessened] his over all [sic] level of function” over time, to an extent Sullivan could not quantify.[7] Similarly, Sullivan reported Williams’s performance on recent achievement tests is “quite likely ... lower than [his] level of function when he was able to graduate from [high school] and attend college,” with “[t]he source of this decline ... most probably a combination of ongoing substance abuse and worsening mental illness.” And, when asked directly about the effect of Williams’s “extensive drug and alcohol abuse” on his current test scores, Sullivan testified Williams’s “testing scores [absolutely would] have been better than they are right now” had he “never pick[ed] up a drug or a drink.” Thus, Sullivan, an expert in assessing cognitive functioning, disagreed with Weinstein’s opinion that Williams’s use of drugs and alcohol as an adult “would not have significantly reduced his overall cognitive abilities” as they existed before the age of eighteen.
¶ 20 As the respondent judge observed, Sullivan’s opinion that Williams’s test scores would have been higher, by some incalculable amount, when he graduated from high school supports a conclusion that Williams’s full scale IQ was higher than seventy at the age of eighteen, and only declined to its current level during Williams’s adult years, due to his “drug and alcohol abuse and worsening mental illness.” Based on this evidence alone, the respondent reasonably could have found the evidence less than clear and convincing— and thus insufficient — to establish that Williams suffered from significantly subaver-age general intellectual functioning with an onset that occurred “before [he] reached the age of eighteen.” § 13-753(K)(3).
¶ 21 The respondent judge’s determination finds further support in Martinez’s opinions that Williams “was able to perform at higher levels of adaptive and intellectual functioning in adolescence and adulthood” when he abstained from alcohol and drugs and that “no evidence” demonstrates Williams had the intellectual and adaptive behavior deficits required by § 13-753 “prior to the age of eighteen.” The absence of clear and convincing evidence establishing that *228 Williams had an IQ of seventy or below before the age of eighteen provided a sufficient basis to deny Williams’s pre-trial claim under § 13-753(G). See Moormann, 672 F.3d at 648-49; Arellano, 213 Ariz. 474, ¶ 21, 143 P.3d at 1020.
¶ 22 Williams challenges the respondent judge’s rejection of the “retrospective analysis” performed by Weinstein, whose opinion is based in part on interviews he conducted with seventeen people who knew Williams before and after the age of eighteen, including family and extended family members, former classmates and friends, work supervisors, and a high school administrator. In addition to reporting their memories of Williams at different ages, Williams’s mother told Weinstein she had used alcohol and drugs and had tripped on some stairs while pregnant with Williams, and other interviewees reported Williams had landed on a hard floor when dropped as an infant and had been physically and sexually abused as a child.
¶ 23 The respondent judge found, “Dr. Weinstein’s ... methodology ... is not per-suasive____ In particular, Dr. Weinstein’s ‘history1 is suspect. It is largely supported by biased reports. No independent or verifiable evidence supports it.” According to Williams, “[T]o find that such an analysis cannot meet a clear and convincing standard is tantamount to denying mentally retarded individuals who are substantially older than [eighteen]” the protection afforded by Atkins, “because [their intellectual disability] would be impossible to prove.”[8]
¶ 24 But a trial court is required to evaluate the weight and credibility of the evidence produced to support a finding of mental retardation. Grell II, 212 Ariz. 516, ¶ 58, 135 P.3d at 708. And, on appeal, a finding of fact cannot be clearly erroneous if substantial evidence supports it, even though substantial conflicting evidence also exists. State v. Ber-ryman, 178 Ariz. 617, 623, 875 P.2d 850, 856 (App.1994), citing Moore v. Title Ins. Co. of Minn., 148 Ariz. 408, 413, 714 P.2d 1303, 1308 (App.1985). “We do not reweigh the evidence to decide if we would reach the same conclusions as the trier of fact.” State v. Carey, 186 Ariz. 121, 124, 920 P.2d 1, 4 (App.1995).
¶ 25 Williams’s argument essentially begs the question our supreme court answered in Grell II, when it concluded that “requiring the defendant to prove mental retardation by clear and convincing evidence in the initial retardation hearing does not violate constitutional standards.” Grell II, 212 Ariz. 516, ¶ 41, 135 P.3d at 705. In a case such as this, where a defendant’s intellectual and adaptive functioning were not tested when he was a child, or where such test results are unavailable, a trial court must consider whether inferences from other evidence establish that the onset of concurrent deficits in these areas, sufficient to meet statutory requirements, occurred before the defendant reached the age of eighteen. See Arellano, 213 Ariz. 474, ¶ 21, 143 P.3d at 1020-21 (noting “pre-age-eighteen IQ test results are not always available”). That appears to be what the respondent judge did in this ease. Nothing in the record suggests the respondent categorically excluded evidence that might be offered in support of an older defendant’s Atkins claim; to the contrary, in his order, the respondent painstakingly summarized the evidence presented and set forth the reasons he found certain evidence more or less persuasive.
¶ 26 As the respondent judge pointed out, both Weinstein and Sullivan identified problems with the reliability of retrospective anal-yses. Moreover, Sullivan explained that he regarded in útero insult and childhood abuse as “risk factors,” rather than “causative factors” responsible for Williams’s present condition, because he had no documentation to corroborate reports that Williams’s mother had used drugs and alcohol while pregnant or that Williams had been abused as a child. Sullivan testified, “[I]f we ... had birth records that show he was born a crack baby and we had his mother laying it out on the line being honest about what actually happened then[, when Williams was born,] ... they would become causative factors, right now I just don’t know.” In light of Sullivan’s doubts about the veracity of these reports, *229 we cannot say the respondent clearly erred in finding the history of sexual and physical abuse and in útero insults, obtained from Williams and his family, less than clear and convincing evidence that Williams suffered the impairments required by § 13-753(K) before the age of eighteen.
¶ 27 Williams nonetheless challenges — as “illogical and contrary to the evidence” — the respondent judge’s conclusion that Williams failed to show the onset of the required impairments occurred before the age of eighteen, and he asserts “the only plausible explanation for [Williams’s] condition is prenatal insult combined with childhood physical and sexual abuse.” Specifically, Williams cites the testimony of Sullivan and Weinstein to support the proposition that “unless there is a credible explanation for how a person could become functionally retarded after age [eighteen], ... it is assumed that the condition occurred prior to” that age.
¶ 28 Williams is referring to Sullivan’s testimony that “neuropsychological impairments are presumed to be neurodevelopmental in nature” and occurring “early on in the life span until proven otherwise” by an adequate medical explanation for brain damage occurring as an adult, such as a traumatic brain injury, stroke, or certain kinds of substance abuse. But Sullivan also testified Williams’s substance abuse was a “contributing factor” to his intellectual impairment and accounted for some portion of the deficits currently reflected in his full-scale IQ test score of seventy; thus, as already discussed, according to Sullivan, Williams’s IQ test scores would have been higher than seventy in late adolescence and early adulthood. Similarly, Martinez concluded Williams’s current full-scale IQ score of seventy did not evince an onset of that condition prior to the age of eighteen, particularly where there was “no indication” Williams routinely had “performed in the significantly impaired range of intellectual functioning” while in public school. These expert opinions constitute reasonable evidence that supports the respondent judge’s findings, even if other, contradictory evidence may be found in the record. See State v. McCurdy, 216 Ariz. 567, 573,169 P.3d 931, 937 (App.2007) (“substantial evi-denee” supports finding “[i]f reasonable persons could differ as to whether the evidence establishes a fact in issue”); State v. Mercer, 13 ArizApp. 1, 2, 473 P.2d 803, 804 (1970) (conflicts in testimony do not render evidence insufficient); see also State v. Canez, 202 Ariz. 133, ¶ 114, 42 P.3d 564, 594 (2002) (according “great deference” to trial court’s resolution of conflicting psychological evidence offered by experts).
¶ 29 Quoting Nicholson v. Branker, 739 F.Supp.2d 839, 857 (E.D.N.C.2010), Williams maintains there is “no requirement that [a defendant] show he had scored [seventy] or below on a[n IQ] test given prior to the age of [eighteen]” to establish his mental deficiency “manifested before [eighteen] years of age.” We do not suggest otherwise. See Arellano, 213 Ariz. 474, ¶ 21, 143 P.3d at 1020-21. We agree with those authorities concluding that, when no childhood IQ tests were performed, subaverage intellectual functioning before the age of eighteen properly may be inferred from other evidence of intellectual functioning, such as school performance. See, e.g., Rivera v. Quarterman, 505 F.3d 349, 363 (5th Cir.2007). But the respondent judge was not required to infer that Williams had suffered, as a child, from the level of intellectual impairment required to establish an intellectual disability under Arizona law, particularly in light of Sullivan’s and Martinez’s opinions to the contrary. See Pizzuto v. State, 146 Idaho 720, 202 P.3d 642, 651 (2008) (trial court considering Atkins claim not required to infer defendant’s IQ “had not decreased during the eleven-year period from his eighteenth birthday to the date of his IQ test[,] ... especially in light of the opinions of [his own] experts that his long history of drug abuse and his epilepsy would have negatively impacted his mental functioning”); Commonwealth v. Vandivner, 599 Pa. 617, 962 A.2d 1170, 1186-87 (2009) (insufficient evidence of onset before age eighteen where expert testified head injuries and other conditions occurring in adulthood “led to a decline in cognitive capacity”; refusing to extend categorical prohibition against execution of mentally retarded to other capital defendants with mental deficiencies absent evidence of “national consensus” found in Atkins).
*230 ¶ 30 Because we conclude the respondent judge did not err in finding Williams failed to establish by clear and convincing evidence he had significantly subaverage general intellectual functioning before the age of eighteen, we need not review his ruling that “[i]t certainly is not ‘clear’ ” that Williams suffered from significant impairments in adaptive behavior, either before or after the age of eighteen. See State v. Snelling, 225 Ariz. 182, n. 8, 236 P.3d 409, 417 n. 8 (2010) (when one issue dispositive, court need not reach other issues). However, we will address briefly the issues Williams raises, because many of his arguments are related to this determination.
¶ 31 In finding the evidence of adaptive impairments less than clear and convincing, the respondent judge noted that Williams “went to school, traveled by bus, stayed out of trouble, graduated from school on time, went to college, and was employed, at one job for several years.” The respondent appears to have relied on Martinez’s opinion that any difficulties Williams experienced in adaptive behavior did not rise to the level of the “significant impairment” required to support a finding of intellectual disability under Arizona law. See § 13-753(K)(3).
¶ 32 Williams first seems to suggest the respondent judge abused his discretion in relying on Martinez’s report and testimony; he contends Martinez conducted only a “cursory assessment” of Williams’s intellectual and adaptive functioning and is only “marginally qualified” when compared to Sullivan and Weinstein. But Williams does not contend Martinez was unqualified or his testimony was incompetent under the requirements of § 13-753. Although Williams asserts Martinez had “no foundation” for his opinion that, had Williams suffered from an intellectual disability, his deficits in intellectual functioning and adaptive behavior would have been identified while he was in public school, Martinez testified he had once been employed as a school psychologist. Williams is correct that Martinez professed no knowledge of the policies employed by the particular public schools Williams had attended, but although this limitation might affect the weight of the evidence, it does not render it inadmissible. See State v. Davolt, 207 Ariz. 191, ¶ 70, 84 P.3d 456, 475 (2004) (degree of expert’s qualifications goes to weight of testimony, not its admissibility).
¶ 33 Williams had a full opportunity to examine Martinez on his knowledge and experience, and we see no clear error in the respondent judge’s consideration of this testimony. Carey, 186 Ariz. at 124, 920 P.2d at 4 (reviewing court does not reweigh expert testimony); State v. Wassenaar, 215 Ariz. 565, ¶ 2, 161 P.3d 608, 612 (App.2007) (reviewing court resolves conflicts in evidence in favor of sustaining judgment).
¶ 34 Citing AAIDD assessment guidelines, Williams also asserts Martinez and the respondent judge “relied upon [Williams’s] adaptive strengths, as opposed to [his] deficits, which is not a proper consideration in an adaptive behavior analysis,” because “mentally retarded people are capable of many adaptive functions.” But in Grell II, our supreme court emphasized that Arizona’s statutory definition, “while similar in overall meaning, is not the same as” clinical definitions, and “requires an overall assessment of the defendant’s ability to meet society’s expectations of him,” not “proof of specific deficits.” Grell II, 212 Ariz. 516, ¶ 62, 135 P.3d at 709. As in this case, the decision under review in Grell II “was based largely on expert testimony,” and “the trial court determined that the State’s expert was more credible.” Id. ¶ 58. Deferring to the court’s broad discretion in determining the weight and credibility afforded expert testimony, our supreme court affirmed the court’s ruling. Id. ¶ 63.
¶ 35 The respondent judge’s reasoning here appears consistent with the ruling affirmed in Grell II, and we decline to adopt a standard for analysis inconsistent with that decision or the deference it requires. See id. ¶¶ 61-62 (state countered evidence of Grell’s poor academic and social behavior “with three main themes: no doctor before defense expert ... had ever diagnosed Grell as having mental retardation; behaving badly does not necessarily indicate adaptive deficits; and Grell can behave himself when he wants to do so”); Grand v. Nacchio, 214 Ariz. 9, ¶ 19, 147 P.3d 763, 771 (App.2006) (declining *231 to apply doctrines that might “effectively nullify” test adopted by supreme court); see also Hooks v. Workman, 689 F.3d 1148, 1172 (10th Cir.2012) (AAIDD’s “clinical standard” of considering deficits rather than strengths “not a constitutional command” nor required by Atkins); Ortiz v. United States, 664 F.3d 1151, 1168-69 (8th Cir.2011) (Atkins did not “delegate[] to the scientific community the finding of whether an individual is mentally retarded”; rejecting standard limiting assessment to adaptive deficits because “[c]onsideration of ... strengths” may “provide context and definition for consideration of reported deficits”); Clark v. Quarterman, 457 F.3d 441, 445 (5th Cir.2006) (Atkins “did not dictate that the approach and the analysis of the State inquiry must track the approach of the AAMR or the APA exactly”).
¶ 36 In other arguments that the respondent judge erred in finding insufficient evidence of adaptive behavior impairment, Williams challenges the manner in which the respondent weighed the evidence and the inferences he drew from undisputed facts. But in our review of the respondent’s ruling pursuant to § 13-753, we defer to his resolution of conflicting evidence, and we do not substitute our independent judgment for his. Grell III, 231 Ariz. 153, ¶¶ 9-10, 291 P.3d at 353; Grell II, 212 Ariz. 516, ¶ 63, 135 P.3d at 709; Gen. Elec. Capital Corp. v. Osterkamp, 172 Ariz. 185, 188, 836 P.2d 398, 401 (App. 1992) (reviewing court will not “second-guess or substitute [its] judgment” for trial court’s resolution of disputed fact).
The Dissent
¶ 37 As an initial matter, it appears our dissenting colleague has reached an issue that Williams did not raise below, a practice we ordinarily avoid. See, e.g., Cornerstone Hosp. of Se. Ariz., L.L.C. v. Mamer, 231 Ariz. 67, n. 4, 290 P.3d 460, 472 n. 4 (App. 2012). The limited record before us contains no indication that Williams had argued the definition of intellectual disability in § 13-753 is unconstitutional or that the respondent judge considered such a claim. Although the respondent referred informally to “an Atkins hearing” in his order, he clearly conducted the hearing and entered his ruling in accordance with § 13-753, applying that statute’s definitions in the proceeding it mandated. See § 13-753(G), (K). The dissent maintains the respondent erred precisely because he ruled in “conformity with the statutory standard,” when he instead should have rejected the statutory definition in favor of a “clinical definition” promulgated by the APA or AAIDD. See infra ¶¶ 53, 61-62.
¶38 First, as addressed above, we conclude our supreme court considered and rejected a nearly identical argument in Grell II, 212 Ariz. 516, ¶¶ 60-63, 135 P.3d at 709. According to the dissent, the court in Grell II did not expressly consider whether the definition of intellectual disability in § 13-753 is consistent with the holding in Atkins, and this remains an open issue. See infra ¶¶ 48, 78-79. But the fact remains that in Grell II, after resolving other “issues of constitutional law and statutory construction” and recognizing state procedures to identify mentally retarded capital defendants “must comport with the Constitution,” 212 Ariz. 516, ¶¶ 22, 24, 135 P.3d at 701, 702, the court rejected the defendant’s argument that he had established mental retardation pursuant to the DSM-IV definition, explaining that, “while similar in overall meaning, [that standard] is not the same as the statutory definition.” Id. ¶ 62. The court then relied on this distinction in finding, based on an “overall assessment” of adaptive functioning permitted by Arizona’s statute, substantial evidence supported the trial court’s ruling that Grell had failed to sustain his burden of proving mental retardation. Id. ¶¶ 62-63. When later conducting its own independent review of Grell’s death sentence, the court again relied on the statutory definition to guide its analysis, albeit with a different result. Grell III, 231 Ariz. 153, ¶¶ 5, 7, 15, 34, 291 P.3d at 351-52, 353, 356-57; see also State v. Boyston, 231 Ariz. 539, ¶¶ 34-36, 298 P.3d 887, 895 (2013) (“[although the DSM-IV defines impairments in adaptive functioning based on deficits in two areas,” that definition “is not the same as the statutory definition,” which, “by contrast, ‘requires an overall assessment of the defendant’s ability to meet society’s expectations of him’”), quoting Grell II, 212 Ariz. at 518, ¶ 62, 135 P.3d at 709.
*232 ¶39 Thus, Arizona’s supreme court appears to have interpreted Atkins as “leaving the definition of mental retardation to the states,” such that the prohibition against executing the mentally retarded “depends on the state’s definition of mental retardation.” State v. Roque, 213 Ariz. 193, ¶ 149, 141 P.3d 368, 402 (2006); Grell II, 212 Ariz. 516, ¶ 37, 135 P.3d at 705 (knowing that “states had already begun to develop their own procedures, and had drawn in different places the line for establishing the mental retardation that would bar execution,” Supreme Court “left states ... free to craft their laws for determining which defendants meet the [national] consensus standard”).
¶40 Second, although the dissent asserts “the Court [in Atkins ] defined mental retardation by the diagnostic criteria universally accepted by clinicians,” infra ¶ 51, this position is contrary to pronouncements from the United States Supreme Court and every other state court that has addressed the issue. The Supreme Court itself has stated that Atkins “did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation ‘will be so impaired as to fall [within Atkins’ compass]’ ” but left enforcement of the constitutional restriction to the states. Bobby v. Bies, 556 U.S. 825, 831, 129 S.Ct. 2145, 173 L.Ed.2d 1173 (2009), quoting Atkins, 536 U.S. at 317, 122 S.Ct. 2242 (emphasis added); Moormann v. Schriro, 672 F.3d 644, 648 (9th Cir.2012) (Atkins “did not define mental retardation as a matter of federal law”); see also Julie C. Duvall & Richard J. Moms, Assessing Mental Retardation in Death Penalty Cases: Critical Issues for Psychology and Psychological Practice, 37 Prof. Psychol.: Res. & Prac. 658, 658 (2006) (Atkins “did not define mental retardation” or identify “any terms or procedures that could guide legislatures or judges in determining” those defendants “ ‘so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus’ ”), quoting Atkins, 536 U.S. at 317, 122 S.Ct. 2242. Additionally, every other state court that has addressed the issue has determined or implied that Atkins allows the states to define mental retardation without strict adherence to the clinical standards. Of the thirty-three states that still permit use of the death penalty, courts in twenty-three have stated or implied that Atkins did not define mental retardation, but instead left that task to individual states. See infra Appendix 1. The other ten states have not spoken on the issue. Many state statutes also define mental retardation or intellectual disability in ways that vary from the AAMR, AAIDD, and DSM-IV definitions. See infra Appendix 2. As noted above, several courts have expressly rejected the proposition that states must strictly adhere to clinical definitions or assessment standards. See supra ¶ 35.
¶ 41 Third, Arizona’s statute was among those enacted before Atkins was decided and was found to be evidence of the “national consensus” that mentally retarded offenders should not be executed. See Atkins, 536 U.S. at 314-15, 122 S.Ct. 2242. The dissent acknowledges the Supreme Court’s statement that existing “statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions [of the AAMR and APA],” Atkins, 536 U.S. at 317 n. 22, 122 S.Ct. 2242, and maintains this observation served only “to reinforce the conclusion that a true national consensus had coalesced around” those clinical definitions. See infra ¶ 74. But the placement of this footnote suggests otherwise. It appears at the end of a paragraph in which the Court addressed “disagreement ... in determining which offenders are in fact retarded” and immediately after the Court’s statement that it would leave to the states “the task of developing appropriate ways to enforce the constitutional restriction.” Atkins, 536 U.S. at 317, 122 S.Ct. 2242. Thus, in context, the Supreme Court signaled that those states that had already enacted statutes prohibiting execution of the mentally retarded, including Arizona, had met this task by adopting definitions of mental retardation that “generally conform” to clinical standards. Id. at 317 & n. 22, 122 S.Ct. 2242.
¶ 42 Fourth, we agree with the state that, as a policy matter, requiring strict adherence to clinical standards could create some instability in this area of the law. As we have seen, clinical standards may change over time, see supra note 4; it seems unlikely the *233 Supreme Court would have delegated the interpretation of the Eighth Amendment to clinicians. Rather, deference to state legislation that generally conforms to clinical standards is consistent with the Court’s recognition that “‘[cjourts are not representative bodies’ ” and do not act “as legislators,” and that, “under our federal system,” the deference owed “state legislatures ... is enhanced where the specification of punishments is concerned, for ‘these are peculiarly questions of legislative policy.’ ” Gregg v. Georgia, 428 U.S. 153, 174-76, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), quoting Dennis v. United States, 341 U.S. 494, 525, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring) (alteration added) and Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); see also Panetti v. Quarterman, 551 U.S. 930, 957, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (Supreme Court has yet to “set forth a precise standard for competency” to be executed under Ford v. Wainwright); Addington v. Texas, 441 U.S. 418, 431, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (“The essence of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold”; noting substantive and procedural standards for civil commitment “may vary from state to state, ... so long as they meet the constitutional minimum”).
¶ 43 Finally, we note that our dissenting colleague focuses on the respondent judge’s analysis of Williams’s adaptive functioning and does not address his determination that Williams also failed to present clear and convincing evidence of a substantial impairment in intellectual functioning before the age of eighteen. Nor does the dissent address our conclusion that this finding was consistent with the evidence and independently sufficient to support the respondent’s ruling. See supra ¶¶ 29-30; see also Pruitt v. State, 834 N.E.2d 90, 110 (Ind.2005) (affirming death penalty, notwithstanding court’s erroneous application of “too restrictive” standard to determine “substantial impairment of adaptive behavior,” where record supported conclusion defendant failed to prove significantly subaverage intellectual functioning).
¶ 44 Accordingly, we conclude we are bound by our supreme court’s pronouncements on this issue. The conclusion that states may enforce the prohibition in Atkins by implementing definitions that “generally conform” to clinical standards, 536 U.S. at 317 n. 22, 122 S.Ct. 2242, as Arizona’s statutory definition does, id. at 314-15, 317 n. 22, 122 S.Ct. 2242, finds further support in a later statement by the United States Supreme Court and in each state court case that has addressed the issue. Therefore, we cannot accept the dissent’s position.
¶ 45 We do not mean, as the dissent suggests, that the Supreme Court “intended to ... preclude any future conceivable specific Eighth Amendment challenge” to statutes enacted before Atkins, see infra note 22; rather, the Court has stated clearly that as-applied challenges might be expected. See Schriro v. Smith, 546 U.S. 6, 7-8, 126 S.Ct. 7, 163 L.Ed.2d 6 (2005) (per curiam) (noting states’ “measures for adjudicating claims of mental retardation” by capital defendants “might, in their application, be subject to constitutional challenge”; Ninth Circuit exceeded authority in “pre-emptively” ordering jury determination). But in light of our own supreme court’s repeated statements that the statute is based on and generally conforms to clinical standards, as well as its rejection of the nearly identical position taken by the defendant in Grell II, we must leave any changes in that position to the supreme court. See Roque, 213 Ariz. 193, ¶ 149, 141 P.3d at 402 (Arizona statute based on “accepted medical definitions”); Grell II, 212 Ariz. 516, n. 4, 135 P.3d at 699 n. 4 (statut2ory definition “substantially consistent” with criteria cited in Atkins); Grell I, 205 Ariz. 57, n. 4, 66 P.3d at 1241 n. 4 (Arizona’s statute “appears to comport substantively and proeedurally with the principles set forth in Atkins ”); State v. Canez, 205 Ariz. 620, n. 2, 74 P.3d 932, 938 n. 2 (2003) (Arizona’s statutory definition of mental retardation “very similar to that set forth in the DSM-IV”); see also Ybarra v. State, 247 P.3d 269, 274-75 (Nev. 2011) (adaptive functioning “ ‘refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socioc *234 ultural background, and community setting’ ”), quoting DSM-IV 42; State v. Long, 207 Ariz. 140, ¶ 23, 83 P.3d 618, 623 (App. 2004) (“This court is bound by decisions of the Arizona Supreme Court and has no authority to overturn or refuse to follow its decisions.”).
Disposition
¶46 As our supreme court has observed, “Reasonable minds may differ as to how to interpret the evidence presented,” but this does not provide a basis for relief from the respondent judge’s ruling. Grell II, 212 Ariz. 516, ¶ 63, 135 P.3d at 709. On this record, we cannot say the respondent clearly erred in finding Williams failed to prove by clear and convincing evidence that he is mentally retarded or has an intellectual disability. See § 13-753(G). Accordingly, we deny relief.
CONCURRING: J. WILLIAM BRAMMER, JR., Judge.*
ECKERSTROM, Presiding Judge,

. Since Atkins was decided, the American Association on Intellectual and Developmental Disabilities (AAIDD), formerly known as the American Association on Mental Retardation (AAMR), has changed the designation of this disability from "mental retardation” to "intellectual disability.” See Coleman v. State, 341 S.W.3d 221, 226 n. 5 (Tenn.2011) (noting change; terms "mental retardation” and "intellectual disability” "interchangeable”); Robert L. Schalock et al., The Renaming of Mental Retardation: Understanding the Change to the Term Intellectual Disability, 45 Intell. & Developmental Disabilities 116, 120 (2007) ("intellectual disability” "currently preferred term” for mental health profession to describe same "population of individuals who were diagnosed previously with mental retardation in number, kind, level, type, and duration of the *223 disability”). Consistent with this change in terminology, § 13-753 was amended in 2011 to substitute “intellectual disability” for "mental retardation” with no substantive changes to the statute. See 2011 Ariz. Sess. Laws, ch. 89, § 5.

. Sullivan administered the Wechsler Adult Intelligence Scale 4 (WAIS-4), and reported Williams had a full-scale IQ of seventy, with ninety-five percent confidence that his "true IQ” would fall between sixty-seven and seventy-five. Psychologist Serena Gorgueiro administered the Stanford-Binet 5 and reported Williams had a full-scale IQ of sixty-eight, with a range of sixty-five to seventy-three.

. Now the American Association on Intellectual and Developmental Disabilities (AAIDD), see supra note 1.

. This description continues to be accurate. The AAIDD since has modified diagnostic criteria that had required " 'limitations in at least 2 of the 10 specific skill areas listed in [the AAMR's] 1992 definition’ ” and had been "the model for the approach still used by the APA.” United States v. Hardy, 762 F.Supp.2d 849, 879 (E.D.La. 2010), quoting AAMR, Mental Retardation Definition, Classification, and Systems of Supports 73 (10th ed. 2002) [hereinafter AAMR 10th Edition] (alteration in Hardy); see also Atkins, 536 U.S. at 309 n. 3, 122 S.Ct. 2242. Since 2002, the AAMR/ AAIDD has defined the disability as " 'characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills’ ” that originate before age eighteen, explaining that using these " 'three broader domains of conceptual, social, and practical skills’ ” to identify adaptive limitations is " 'more consistent with the structure of existing measures and with the body of research on adaptive behavior.' ” Hardy, 762 F.Supp.2d at 852, 879, quoting AAMR 10th Edition at 1, 73, 78.

. Section 13-703.02, A.R.S., cited in Grell I, has been renumbered as § 13-753. 2008 Ariz. Sess. Laws, ch. 301, § 26. We refer here to the current statute.

. The court noted Grell’s death sentence was subject to independent review because he had committed the murder before August 1, 2002. Grell III, 231 Ariz. 153, ¶ 3, 291 P.3d at 351; see also § 13 — 755(A). For capital murders committed on or after August 1, 2002, our supreme court does not conduct an independent review of the propriety of a death sentence, but “deter-minéis] whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death.” See A.R.S. § 13-756(A); State v. Cota, 229 Ariz. 136, ¶¶ 90-92, 272 P.3d 1027, 1044 (2012) (section 13-756 sets appellate standard of review; review of death sentence for abuse of discretion under § 13-756 constitutionally permissible; Constitution does not require independent review of whether "appellate court itself would have imposed a death sentence”). It appears Williams's claim of mental retardation would be subject to the court’s automatic review of the propriety of any death sentence that may be imposed in the future, although the evidence may be reviewed for an abuse of discretion, rather than independently. Cf. A.R.S. § 13-752 ("The trier of fact shall make all factual determinations required by this section or the Constitution of the United States or this state to impose a death sentence. If the defendant bears the burden of proof, the issue shall be determined in the penalty phase.”); § 13-756(A).

. When asked if he could quantify the relative effects of substance abuse and mental illness in accounting for Williams’s current level of intellectual functioning, Sullivan said he could not, because there were "too many [unknown] variables.” He added that "the history and the issues of the sexual abuse, the physical abuse, [and] the potential in útero insults from the mother” would likely "carry more of the variance” with respect to the impairments, due to the greater "plasticity” of the brain during childhood.

. Williams presently is thirty-nine years old.