**State of Maryland v. Travis Sanders,** No.: 2742, September Term 2015.


**MENTAL HEALTH> COMPETENCY > DISABILITIES AND PRIVILEGES OF MENTALLY DISORDERED PERSONS > INSANITY OR INCOMPETENCY AT TIME OF PROCEEDINGS > CRIMES > PLAIN LANGUAGE; PLAIN ORDINARY, OR COMMON MEANING>**

Travis E. Sanders (the appellee) was charged with numerous criminal offenses including—sex abuse of a minor, sex offense in the second degree, sex offense in the third degree, and second degree assault in connection with alleged events that occurred between June 1 and August 20, 2013. After pleading not guilty and, in the alternative, not criminally responsible, the Circuit Court for Baltimore County ordered an evaluation of the appellee and found that he had a diagnosis of possible mental retardation. The appellee was committed to the Department of Health and Mental Hygiene ("the Department" or "the Health Department") on May 5, 2014 for an assessment of his competency to stand trial. In a report dated May 8, 2014, Dr. Stephen W. Siebert, M.D., M.P.H, a Health Department physician concluded that the appellee may not be competent to stand trial and requested further assessment. On June 5, 2014, Dr. Siebert along with Erik Lane, Psy.D., a Health Department psychologist, found that the appellee may have borderline intellectual functioning per an earlier 2007 assessment, but concluded that the appellee was not competent to stand trial and was a danger to himself or others. Accordingly, on July 22, 2014, the Circuit Court for Baltimore County found the appellee incompetent to stand trial and committed him to the Health Department as a danger to himself or others due to mental retardation (preferred term is intellectual disability).

The Department admitted the appellee to Spring Grove Hospital Center from July 29, 2014 to December 17, 2015. During the appellee's stay, the circuit court received several status reports for the appellee. Three out of four doctors found the appellee to be competent. Another doctor, Dr. Fielding who did not make a determination of competency, found that the appellee had significant intellectual deficits and placed him in the extremely low range of functioning in comparison to men his age. Additionally, he noted that the 2007 assessment mentioned in Drs. Siebert and Lane's reports mistakenly overstated the appellee's reading score and that no one should use the 2007 intelligence estimate. Dr. Fielding's reports were not mentioned in any of the four reporting doctors' reports.

During the appellee's stay at Spring Grove, a Spring Grove social worker assisted the appellee in applying for DDA services. She stated that the appellee should qualify for aftercare services. On March 30, 2015, DDA denied the appellee's application for services concluding that he did not meet the criteria for developmental disability. The report stated that the appellee was entitled to an appeal hearing. However, there is no record of such a request.

A competency hearing was held on December 17, 2015. Appellee's counsel expressed that the DDA improperly denied the appellee's application for services because the agency failed to adequately account for Dr. Fielding's assessment. The court agreed, found the appellee to be incompetent, and ordered among other things, that the appellee was eligible for services.

The State argues that because the court's order places no limitations on the DDA services, it therefore extends the appellee's eligibility for services beyond his commitment to the Department. The State continues that § 3-106 of the Criminal Procedure Article and Title 7 of the Health General Article do not grant the court authority to deem the appellee eligible for DDA services, and that that authority lies in the hands of the Department.

The main issue on appeal is whether the circuit court exceeded its authority when it ordered that the appellee was eligible for services following release from commitment. We hold that the circuit court did exceed its authority and that the statute clearly gives the authority to determine one's eligibility for services to the Health Department. Accordingly, we modify the court's decision, removing the paragraph pertaining to the appellee's eligibility.

Circuit Court for Baltimore County
Case No. 03-K-13-005644

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2742

September Term, 2015
_____

STATE OF MARYLAND

v.

TRAVIS SANDERS
_____

Woodward, C.J.,
Arthur,
Reed,

JJ.
_____

Opinion by Reed, J.
_____

Filed: September 4, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

This case originated in the Circuit Court for Baltimore County, where Travis E. Sanders (hereinafter the "appellee") was charged with sex abuse of a minor, sex offense in the second degree, sex offense in the third degree, and second degree assault in connection with alleged events that occurred between June 1 and August 20, 2013. After pleading not guilty and, in the alternative, not criminally responsible, the appellee was committed to the Department of Health and Mental Hygiene (hereinafter the "Health Department") on May 5, 2014, for an assessment of his competency to stand trial. That assessment resulted in a finding of incompetency, and the circuit court held a hearing on December 17, 2015, to review that determination. Following the hearing, the court ruled that the appellee remained incompetent to stand trial and was "eligible" for Developmental Disabilities Administration ("DDA") services.

The Health Department presents two questions for our review on appeal, which we rephrase:[1]

---

[1] The Health Department presents the following questions:

1. Did the circuit court exceed its statutory authority by finding that Mr. Sanders is eligible for DDA services, when by statute that determination lies solely within the discretion of the DDA?

2. Did the circuit court's finding that Mr. Sanders was eligible for DDA services lack sufficient evidence, where the circuit court considered expert reports that were conducted for the purpose of determining Mr. Sanders's competency, not his eligibility for DDA services; heard no testimony; relied on the lay opinion of defense counsel; failed to consider the statutory criteria for determining eligibility; and gave the Department no opportunity to defend its decision to deny Mr. Sanders's application for eligibility?

1. Did the circuit court exceed its statutory authority when it ordered that the appellee "is eligible for DDA services"?

2. Was the circuit court's decision regarding the appellee's eligibility for DDA services supported by sufficient evidence?

For the following reasons, we answer the first question in the affirmative. Therefore, we need not consider the second question and shall modify the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 30, 2013, the appellee was indicted on various sex offenses allegedly committed between June 1 and August 20 of that year. He entered a plea of not guilty and, in the alternative, not criminally responsible to each count on May 5, 2014. On that same day, citing "possible mental retardation,"[2] the circuit court committed the appellee to the Health Department for an examination as to his competency to stand trial.

---

[2] Because "'intellectual disability' [is the] 'currently preferred term' for [the] mental health profession to describe [the] same 'population of individuals who were diagnosed previously with mental retardation in number, kind, level, type, and duration of the disability,'" *Williams v. Cahill ex rel. Cty. of Pima*, 232 Ariz. 221, 222 (Ct. App. 2013) (quoting Robert L. Schalock et al., *The Renaming of* Mental Retardation: *Understanding the Change to the Term Intellectual Disability,* 45 Intell. & Developmental Disabilities 116, 120 (2007)), the term "mental retardation" has been replaced with "intellectual disability" in many parts of the Maryland Code. *See* Md. Laws, ch. 119 ("Rosa's Law"). However, "mental retardation" still appears in the sections of the Criminal Procedure Article that govern competency to stand trial and criminal responsibility. *See* Md. Code Ann., Crim. Proc. §§ 3-106 & 3-108.

At the federal level, "[t]he *mental retardation* language was changed to 'intellectual disability' when President Obama signed the so-called Rosa's Law in 2010. Rosa's Law drew its name from Rosa Marcellino, a nine year-old girl with Down syndrome." Sarah E. Redfield & Theresa Kraft, *What Color Is Special Education?*, 41 J.L. & Educ. 129 (2012) (emphasis in original).

In a report dated June 5, 2014, Stephen W. Siebert, M.D., M.P.H., and Erik Lane, Psy.D., both of the Health Department, concluded that the appellee was not competent to stand trial. In an addendum to that report, Drs. Siebert and Lane also concluded that the appellee was a danger to himself or others. Based on these conclusions, on July 23, 2014, the circuit court ordered that the appellee be committed to the Health Department until it was "satisfied that [he] is no longer incompetent to stand trial or is no longer, by reason of a mental disorder . . . , a danger to self or the person or property of another." The Health Department subsequently admitted the appellee to Spring Grove Hospital Center (hereinafter "Spring Grove"), where he remained for care and treatment from July 29, 2014, through December 17, 2015.

During the approximately thirteen months following the appellee's admission to Spring Grove, the court received four additional reports pertaining to the appellee's competency to stand trial. Three of these reports—a January 7, 2015, report by Christopher M. Wilk, M.D., a Health Department physician; a May 1, 2015, report by Melissa Blackwell, Psy.D., a Health Department consultant; and a September 2, 2015, report by Bevin Merles, Psy.D., a Health Department psychologist—concluded with a finding that the appellee was competent to stand trial. Only Beverlie Mormile, Psy.D., a psychologist hired by the Office of the Public Defender, in a report dated July 9, 2015, found that the appellee was not competent to stand trial.

In addition, the court received a report by Eric Fielding, Ph.D., dated June 26, 2015. Unlike the others, Dr. Fielding's report did not address the appellee's competency to stand

3

trial. Instead, pursuant to a court order of January 9, 2015, its purpose was to "clarify [the appellee's] diagnosis for treatment and discharge planning purposes."

In February 2015, the appellee, with the assistance of Denise Leite-Finken, a social worker at Spring Grove, filed an application for DDA services. In a determination letter dated March 30, 2015, the DDA informed the appellee that his application had been denied because he did not meet all the criteria for "developmental disability," and thus, did not meet the statutory criteria for DDA services.

On December 17, 2015, the circuit court held a hearing to review its July 2014 determination that the appellee was not competent to stand trial. After the hearing, the court issued the following written order:

**ORDER**

It is this 17th day of Dec[ember], 2015, by the Circuit Court for Baltimore County ORDERED:

That upon consideration of the report of Eric Fielding, Ph. D., Spring Grove State Hospital Department of Clinical Psychology dated June 26, 2015 and the report of Beverli [sic] Mormile, Psy.D. dated July 9, 2015, it is the finding of the Court that the Defendant Travis Eugene Sanders, having been charged with the commission of a crime, remains incompetent to stand trial because of an intellectual disability (intellectual developmental disorder) and remains a danger to self or the person or property of another, and it is further:

ORDERED, the defendant Travis Eugene Sanders is committed to the Department of Health and Mental Hygiene for placement in a Developmental Disabilities Administration (DDA) facility until the Court is satisfied the Defendant is no longer incompetent to stand trial or is no longer a danger to self or the person or property of others, and it is further

4

ORDERED *that the defendant Travis Eugene Sanders is eligible for DDA services*, and it is further

ORDERED that immediately upon receipt of this order, Spring Grove State Hospital Center shall transport the defendant Travis Eugene Sanders to the Developmental Disabilities Administration facility that the Department designates.

(Emphasis added).

On January 19, 2016, the Health Department filed a timely notice of appeal to this Court.

## DISCUSSION

## I. Eligibility for DDA Services

## A. Parties' Contentions

The Health Department argues that because the circuit court's December 17, 2015 order places no limitations on the DDA services for which appellee is eligible, it "has the effect of mandating that Mr. Sanders be deemed eligible for DDA services following his release from commitment to the Department." Such effect, the Health Department asserts, is impermissible because "[n]o statutory provision of the Criminal Procedure Article expressly authorizes the circuit court to determine a criminal defendant's eligibility for post-commitment DDA services." The Health Department contends that in addition to its plain meaning, the structure and legislative history of § 3-106(b) of the Criminal Procedure Article ("CP") of the Maryland Code require us to construe the statute against the circuit court's order. The Health Department argues that any other reading of CP § 3-106(b) would put it at odds with Title 7 of the Maryland Code's Health General Article ("HG"). In that

5

case, the Health Department asserts that under *Suter v. Stuckley*, 402 Md. 211, 231 (2007), Title 7 of the Health General Article, as the more specific of the two irreconcilable statutes, would apply.

Lastly, the Health Department contends that not only did the circuit court exceed its statutory authority in ordering that the appellee "is eligible for DDA services," but it also authorized the expenditure of state funds and usurped the discretionary functions of an administrative department in violation of the Separation of Powers Article of the Maryland Declaration of Rights.

The appellee responds that "[t]he circuit court's declaration that Mr. Sanders 'is eligible for DDA services' was consistent with the legal mandate of [CP] § 3-106(b)." In support of this argument, the appellee points specifically to the following statutory language: "If a court commits the defendant because of mental retardation, the Health Department shall require the Developmental Disabilities Administration to provide the care or treatment that the defendant needs." CP § 3-106(b)(2). The appellee concedes that pursuant to HG § 7-403(b), in order for an individual to qualify for DDA services, he must, generally, satisfy the Health General Article's five-part definition of "developmental disability." However, because "intellectual disability" is defined as "a *developmental disability* that is evidenced by significantly subaverage intellectual functioning and impairment in the adaptive behavior of an individual," HG § 7-101(k) (emphasis added by appellee), the appellee argues that the circuit court's finding that he was incompetent to stand trial due to "mental retardation" necessarily entailed a finding that he had a

developmental disability. *See supra* n. 2 (explaining that in many legislative contexts, an intellectual disability was once called "mental retardation").

The appellee further asserts that the circuit court's finding regarding his eligibility for DDA services merely ensures that he "is not deprived of his constitutionally protected due process interests in 'conditions of reasonable care and safety.'" (Quoting *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)).

Finally, the appellee contends that "[b]y its plain language, [CP] § 3-106 does not impose any temporal limitations on the DDA's duty, but simply provides that the '[Health] Department shall require the Developmental Disabilities Administration to provide the care or treatment that the defendant needs.'" Therefore, and because the Health General Article defines "services" as encompassing "residential, day, or other services," HG § 7-101(n), the appellee argues that "[i]t would be illogical to conclude that a defendant in Mr. Sanders's position is no longer eligible for DDA services simply because he is discharged from a residential facility."[3]

## B. Standard of Review

"Where an order involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are "legally correct" under a *de novo* standard of review." *Schisler v. State*, 394 Md. 519, 535 (2006).

---

[3] The parties made additional arguments pertaining to whether the evidence was sufficient to support a finding that the appellee was eligible for DDA services. However, because the circuit court lacked the statutory authority to make this finding in the first place, we need not address these arguments on appeal.

## C. Analysis

In *Merchant v. State*, 448 Md. 75, 94 (2016), addressing another issue related to

Title 3 of the Criminal Procedure Article,[4] the Court of Appeals explained that

> [t]he cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application.
>
> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope. Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory

---

[4] The issue in *Merchant* was to determine "the standard of review applicable to a circuit court's review of the findings and recommendations of an Administrative Law Judge . . . for the grant or revocation of a conditional release for a 'committed person' pursuant to [CP §§ 3-114 *et seq.*]" 448 Md. at 94.

scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose and relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense.

*Id.* at 94–95 (quoting *Gardner v. State,* 420 Md. 1, 8–9, 20 A.3d 801, 806 (2011)). With these principles of statutory construction in mind, we now turn our attention to whether the circuit court exceeded its authority when it ruled that the appellee "is eligible for DDA services."

The circuit court's authority to commit a defendant to a designated Health Department facility upon a finding that he is incompetent to stand trial is derived from CP § 3-106(b)[5], which provides:

**Commitment of defendant to designated facility**

(b)(1) If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or the person or property of another, the court may order the defendant committed to the facility that the Health Department designates until the court finds that:

(i) the defendant no longer is incompetent to stand trial;

(ii) the defendant no longer is, because of mental retardation or a mental disorder, a danger to self or the person or property of others; or

---

[5] The article has since been amended by 2018 Md. Laws HB. No. 111.

> (iii) there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.
>
> (2) If a court commits the defendant because of mental retardation, the Health Department shall require the Developmental Disabilities Administration to provide the care or treatment that the defendant needs.

At issue here is subsection (b)(2) of the above provision. Specifically, we are called upon to determine whether the circuit court's finding that the appellee "is eligible for DDA services" was within its statutory authority to "require the Developmental Disabilities Administration to provide the care or treatment that the defendant needs." For the following reasons, we hold that that the circuit court exceeded its authority when it made a ruling on the appellee's eligibility for DDA services. However, because all other portions of the order were valid, we shall merely modify the judgment below in accordance with Md. Rule 8-604(a)(4). We explain.

Under CP § 3-106, "[i]f . . . the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or the person or property of another, the court may order the defendant committed to the facility that the Health Department designates." *Id.* at § 3-106(b)(1). Moreover, "[i]f a court commits the defendant because of mental retardation, the Health Department shall require the Developmental Disabilities Administration to provide the care or treatment that the defendant needs." *Id.* at § 3-106(b)(2). To reiterate, "we look first to the language of the statute, giving those words their ordinary and natural meaning. When the plain meaning of the language is clear and unambiguous…our inquiry is at an end." *Lewis v. State*, 348 Md.

10

648, 653 (1997) (internal citations omitted). Applying these principles of statutory interpretation, we look at the ordinary and natural meaning, or the plain meaning of the article, and find that its language is clear and unambiguous.

The Criminal Procedure Article clearly grants the court the authority to require the Health Department to provide commitment-based services to defendants whom the court finds to be incompetent and, due to mental retardation or a mental disorder, a danger to themselves or the person or property of others in subsection (b)(1). The court did just that in the second decretal paragraph of its December 17, 2015, order:

> . . . and it is further:

> ORDERED, the defendant Travis Eugene Sanders is committed to the Department of Health and Mental Hygiene for placement in a Developmental Disabilities Administration (DDA) facility until the Court is satisfied the Defendant is no longer incompetent to stand trial or is no longer a danger to self or the personal or property of others[.]

At trial, dialogue between appellee's counsel and the court was as follows:

> [COUNSEL]: I have very mu [sic], very, I have concerns about
>
> [appellee] continuing to be in Spring Grove
>
> [COURT]: As opposed to DDA?
>
> [COUNSEL]: As opposed to DDA.

Given this dialogue, it is clear that the third decretal paragraph, in which the court ordered that the appellee "is eligible for DDA services," was in reference to community-based services and not a committed facility. However, the statutory framework for post-

11

commitment services places the eligibility determination in the hands of the Health Department, not the courts.

Applications for community-based DDA services are governed by HG §§ 7-402 through 7-407 and further delineated in Chapters 10.22.12.04 through .08 of the Code of Maryland Regulations (COMAR). Based upon these statutory and regulatory provisions, it is clear that the legislature intended that determinations regarding an individual's eligibility for post-commitment DDA services be made by the Health Department. For example, HG § 7-404(b) provides:

> (b) The Secretary may not accept an individual for services unless the results of the evaluation are that the individual:
>
> (1) Has developmental disability; or
>
> (2) Does not have developmental disability, but does meet the eligibility requirements for individual support services.

The criteria for having a developmental disability and meeting the eligibility requirements for individual support services are governed by HG §§ 7-101(f) and 7-403(c), respectively:

**Developmental disability**

> (f) "Developmental disability" means a severe chronic disability of an individual that:
>
> (1) Is attributable to a physical or mental impairment, other than the sole diagnosis of mental illness, or to a combination of mental and physical impairments;
>
> (2) Is manifested before the individual attains the age of 22;

12

(3) Is likely to continue indefinitely;
(4) Results in an inability to live independently without external support or continuing and regular assistance; and

(5) Reflects the need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services that are individually planned and coordinated for the individual.

### [Individual support services e]ligibility

(c) To be eligible for individual support services, an individual shall have a severe chronic disability that:

(1) Is attributable to a physical or mental impairment, other than the sole diagnosis of mental illness, or to a combination of mental and physical impairments; and

(2) Is likely to continue indefinitely.

In addition, applicants who are denied DDA services have the right to request an administrative hearing on the Health Department's determination. HG § 7-406(a). The appellee was advised of his hearing rights in the March 30, 2015 determination letter. However, there is no record of him ever requesting a review hearing.

As we noted above, CP § 3-106(b)(2) provides that "[i]f a court commits the defendant because of mental retardation, the *Health Department* shall require the Developmental Disabilities Administration to provide the care or treatment that the defendant needs." *Id.* at § 3-106(b)(2) (emphasis added). This provision clearly does not grant the court authority to determine one's eligibility for DDA services. It makes no mention of eligibility and the rules of statutory interpretation do not allow this court to create a meaning not evidenced or intended. We find Title 7 of the Health General Article,

13

governing Developmental Disabilities Law, to be even more instructive. Under HG § 7-403, the Secretary of the Health Department will determine whether the applicant does or does not have a developmental disability but may still be eligible for support services. The Secretary is also responsible for approving an applicant's application, as well as determining the nature of the disability and the nature of the services that the individual requires. HG § 7-404 reiterates that the Secretary shall determine the nature, extent, and timing of the services to be provided. Thus the authority is granted to the Health Department, not the courts. Therefore, the Health Department is correct. Neither § 3-106 nor Title 7 of the Health General article authorize the circuit court to determine the appellee's eligibility for DDA services. To be clear, however, the trial court's language ordering that the defendant be committed for placement "in a Developmental Disabilities Administration (DDA) facility until the Court is satisfied the Defendant is no longer incompetent to stand trial or is no longer a danger to self or the person or property of others" is a proper and binding order in accordance with CP § 3-106 (b) and the competency statutory scheme. "A court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application." *Price v. State*, 378 Md. 378, 387 (2003) (citing *County Council v. Dutcher*, 365 Md. 399, 416-17 (2001)).

For the foregoing reasons, we hold that the court lacked the statutory authority to order that the appellee was eligible for DDA services beyond those related to his commitment to the Health Department under CP § 3-106(b). Accordingly, pursuant to Md.

14

Rule 8-604(a)(4) (giving the Court of Appeals and the Court of Special Appeals the power to "modify the judgment" below), we hereby modify the December 17, 2015, order so that it shall no longer contain the third decretal paragraph, which states: "ORDERED that the defendant Travis Eugene Sanders is eligible for DDA services[.]"

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY MODIFIED IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY BALTIMORE COUNTY.**